**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTISE J. HOLT, | ) | |
| | ) | Civil Action No. 20-cv-1416 |
| Petitioner, | ) | |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF No. 28 |
| BARRY SMITH, *Superintendent, SCI Houtzdale*, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**MEMORANDUM OPINION**

For the reasons that follow, the operative Second Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Second Amended Petition"), ECF No. 28, will be denied. Likewise, a certificate of appealability will be denied.[1]

## I. RELEVANT FACTUAL BACKGROUND

Petitioner seeks federal habeas relief from his convictions in the Court of Common Pleas of Allegheny County, Pennsylvania, of the following crimes:

- Rape by Forceable Compulsion, in violation of 18 Pa. C.S.A. § 3121(a)(1);
- Statutory Sexual Assault, in violation of 18 Pa. C.S.A. § 3122.1;[2]
- Unlawful Contact with a Minor, in violation of 18 Pa. C.S.A. § 6318(a)(1);[3]
- Sexual Assault, in violation of 18 Pa. C.S.A. § 3124.1;

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge on August 25, 2026. ECF Nos. 17, 31, and 39.

[2] This statute was incorrectly cited as 18 Pa. C.S.A. § 3122.2 in the state trial court opinion on direct appeal. Trial Ct. Op. at 2. The correct citation is on the Court of Common Pleas' docket.

[3] This statute was amended by 2025 Pa. Legis. Serv. Act 2025-5 (Purdon's). Former Section 6318(a)(1) now is codified, in relevant part, at 18 Pa. C.S.A. § 6318(a)(1.2).

- Incest, in violation of 18 Pa. C.S.A. § 4302;
- Indecent Assault, in violation of 18 Pa. C.S.A. § 3126(a)(7);
- Endangering the Welfare of Children, in violation of 18 Pa. C.S.A. § 4304(a)(1); and
- Corruption of Minors, in violation of 18 Pa. C.S.A. § 6301(a)(1).

ECF No. 28 at 1; see also Docket, Com. v. Holt, No. CP-02-CR-13629-2014 (C.C.P. Allegheny Cnty.) (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-02-CR-0013629-2014&dnh=nU6ACCOwp9Qhu60DcBSK%2FQ%3D%3D (last visited Sept. 9, 2026)). For these crimes, Petitioner was sentenced to an aggregate term of imprisonment of 208 to 416 months, followed by five years of probation. ECF No. 28 at 1; Docket, Holt, No. CP-02-CR-13629-2014. Under the most recent iteration of Petitioner's sentence, he is required to register for life as a sex offender. Docket, Holt, No. CP-02-CR-13629-2014. See also ECF Nos. 32-64.

The relevant facts underlying Petitioner's crimes were recited by the trial court in its opinion on direct appeal, which was issued on August 3, 2016.[4]

> The victim, Brionna Holt testified that Appellant is her biological father. (Non-Jury Trial Transcript, Volume I, May 18, 2015, "TT I," 24-25). Holt testified that she lived with her cousin Ashley Marshall for about a year after her mother was incarcerated. (TT I 26). At the age of nine or ten she moved in with Keisha Bryant, a woman Appellant was dating at the time, and the three of them resided in McKeesport. (TT I 27). Holt testified that she moved in to Bryant's residence with her father after Christmas when it was cold outside. (TT I 55-56). Prior to age nine or ten, Holt testified that she never lived with Appellant. (TT I 25). Before living at Bryant's house, she did not see Appellant or visit him except when he was at a half-way house. (TT I 26). While living at Bryant's house, Holt attended school at Founder's Hall. (TT I 25). Holt testified that she experienced some difficulties in school and takes special education classes. (TT I 53-54). Appellant did not permit Holt to have a

[4] The trial court refers to the victim as "Holt" in its opinion on direct appeal. It refers to Petitioner as "Appellant".

computer or Facebook and wanted Holt to do well in school. (TT I 52).

Holt testified that Bryant worked as a taxi driver and had a "crazy" schedule. (TT I 27, 30). Appellant did not have a job while he resided at Bryant's. (TT I 27). Holt stated that on numerous occasions when Bryant left for work, Holt was home alone with Appellant. (TT I 28, 30). Holt testified that she had her own room at Bryant's house and Appellant and Bryant had a room that they shared. (TT I 29). The first time Appellant touched Holt in a sexually inappropriate way was while she was living in Bryant's house sometime in the spring. (TT I 28, 64). She testified that during the instances of sexual touching at Bryant's residence, Appellant called Holt into his room or went into her room, removed her clothes and touched her vagina with his fingers, moving them "in and out." (TT I 31-32). Appellant made noises while performing these acts. (TT I 32). Holt testified that neither Bryant nor anyone else was ever present in the home when Appellant performed these sexual acts on her. (TT I 31-32). She stated that Appellant touched her in a sexually inappropriate way more than ten times. (TT I 32).

When Bryant found out Appellant was cheating on him, she "put Appellant out" and Holt went to live with Roxanne Alexander in East Liberty for about six months while Appellant stayed with his mother. (TT I 32-34). Holt was introduced to Alexander a couple of times while living at Bryant's residence. (TT I 33). Holt was about ten or eleven years old while she was living with Alexander and attended Sunnyside Elementary. (TT I 25, 34). Holt testified that Appellant did not sexually assault her while she was living with Alexander. (TT I 34).

Appellant acquired a new house on Nestle Street in McKeesport and Holt moved from Alexander's apartment back to live with Appellant sometime in the middle of the school year. (TT I 34, 66). Alexander continued to live with her grown children in East Liberty. (TTI 36). She stayed overnight at the Nestle Street residence with Holt and Appellant Monday through Friday, or sometimes Monday through Thursday, but returned to her apartment on the weekends. (TT I 36). Sometimes Holt went with Alexander on the weekends and other times she stayed at the Nestle Street residence with Appellant. (Non-Jury Trial Transcript, June 9, 2015, TT III, 155). Holt testified that Appellant and Alexander had a rocky relationship and about every other month the two of them broke up. (TT I 37). During the break-ups, Alexander left for a period of time and then returned. (TT I 37). Holt testified that while living with Appellant she washed the dishes and cleaned the bathroom. (TT I 71). Appellant was responsible for

the laundry. (TT I 71). Alexander did not do any of the laundry at the Nestle Street residence. (TT I 71).

At the Nestle Street residence, things became more serious as to the ways Appellant sexually assaulted Holt. (TT I 32). The first time Appellant sexually assaulted Holt on Nestle Street was about two months after they moved in. (TT I 67). Holt was thirteen and she recalled that it was a school night. (TT I 37-38). Appellant went out drinking and left Holt home alone. (TT I 38). When Appellant came home, he entered Holt's room and began rubbing her leg and taking her clothes off. (TT I 39). Holt knew that Appellant had been drinking because "she smelled it on his breath." (TT I 38). She stated that Appellant "pulled down his pants and put his penis into [her] vagina." (TT I 39). Holt testified that she was crying and screaming during the estimated 30 minutes that Appellant's penis was inside of her. (TT I 40). Holt did not try to get away and stated that in response to her screaming and crying, Appellant told her to shut up and placed his hand over her mouth. (TT I 40). Holt testified that something came out of Appellant's penis and went on to her sheet. (TT I 40-41). She also stated that she was bleeding from her vagina afterwards. (TT I 41). Appellant told Holt that "he was sorry, [and] that he [would] never do it again. (TT I 41). Holt testified that Appellant hurt her and that she curled up in a ball afterwards and cried the whole night. (TT I 41). Holt did not tell anyone what happened out of fear. (TT I 41). Appellant told her that if she were to say anything to anybody about the incident, he would hurt her mother and her brother. (TT I 46). Holt testified that Appellant washed the bed sheet after he had intercourse with her. (TT I 71).

Appellant had intercourse with Holt twice. (TT I 42). The second time Appellant had intercourse with Holt was about a month after the first incident. (TT I 43). Holt testified that she and Alexander were arguing and Alexander instructed her to get dressed because they were leaving. (TT I 43). Holt was in her room looking for something to wear when Appellant entered. (TT I 43). Holt testified that, at first, she and Appellant were sitting in her room talking, but then Appellant ordered her to "take her clothes off' to which she responded, "no." (TT I 44). Appellant "just looked at [Holt]" and when she tried to get up, he grabbed her and "smacked [her] onto the bed." (TT I 44). Holt screamed and Appellant placed his hands over Holt's mouth and began unbuckling her pants. (TT I 44). Appellant pulled Holt's pants and underwear down to the bottom of her feet and then took his pants off. (TT I 44-45). Holt testified that she recalled being positioned on her back with Appellant on top of her when he placed his penis into her vagina the second time. (TT I 45). She did not recall how long Appellant had intercourse with her the second time or whether or not he ejaculated. (TT I 47). After

Appellant had intercourse with Holt, she got dressed, used the bathroom and then went to her grandmother, Peggy Holt's house. (TT I 47-48). On cross examination, Holt stated that she was not completely sure of the day of the week the second rape occurred. (TT I 73). Holt originally believed the second rape occurred on October 15, 2013, but could not say why she remembered that date. (TT I 74). Holt testified that it was either on the day of or after the second rape that Appellant began threatening Holt because she was going to come forward. (Non-Jury Trial Transcript, Volume II, May 18, 2015, "TT II," 16-17).

Holt testified that soon after Appellant had intercourse with her the second time, Appellant was incarcerated for Driving under the Influence ("DUI") so he did not touch her again. (TT I 49, 75). Counsel stipulated that Appellant was incarcerated on October 26, 2013. (TT I 75). Holt called her mother to make a plan to stay with her over Christmas break and then return to Appellant's house to stay with Alexander. (TT I 48-49). After Appellant was incarcerated, about two months passed before Holt went to stay with her mother. (TT II 49). Holt ran away after Christmas break when it was time for her to return to Appellant's house to stay with Alexander. (TT I 50). When Holt's mother found her and asked her why she ran, she cried and told her that Appellant touched her. (TT I 50). Since Appellant was incarcerated, Appellant testified that she felt safe to tell her mother that Appellant touched her. (TT I 50). Since revealing to her mother that Appellant touched her, Holt has had no subsequent interaction with Appellant. (TT I 50). Holt stated that when she thinks about being assaulted by Appellant, it makes her feel "like shit." (TT I 51).

Dr. Adelaide Eichman testified as an expert in Pediatric Medicine with a focus on diagnosis and treatment of child abuse. Dr. Eichman testified that she was the attending physician on duty when victim, Brionna Holt was seen at the Child Advocacy Center Arch Clinic at Children's Hospital of Pittsburgh ("CHP") due to concern that she had been sexually abused. (TT I 16-17). She testified that Holt had undergone a genital exam, but no rape kit was performed due to the delayed report. (TT I 18-19). Dr. Eichman testified to a reasonable degree of medical certainty that Holt's normal genital exam did not rule out sexual abuse. (TT I 19-20). She testified that a woman's body is, by nature, meant to stretch so doctors at her clinic often find that a child may be the victim of sexual abuse but exhibit no physical evidence of abuse. (TT I 19). Dr. Eichman testified that it would not change her medical opinion in any way if Holt testified to bleeding after the first rape because the genital area heals very quickly. (TT I 19-20).

Stephanie Shane, a forensic interviewer at the CHP, testified that she interviewed Holt on March 5, 2014. (TT II 28). Holt's mother informed Shane that Holt had undergone a medical exam on January 14, 2014, the same day she made the allegations against Appellant. (TT II 29-30). During the forensic interview, Shane and Holt talked about "the first time" and "the last time" with regard to the rapes. (TT II 38). Holt informed Shane that the first time occurred while she and her father were living with Bryant. (TT II 31). Shane asked Holt when the last time was that Appellant raped her and Holt replied that it was when she was thirteen, before Christmas, a couple weeks before he went to jail. (TT II 31). When Shane asked Holt about the circumstances surrounding the "last time" she replied that she was at her house, in her room doing homework when Appellant came into her room, shut the door, turned off the light, television and computer and touched her leg. (TT II 32). Holt told Shane that she tried to run away but Appellant grabbed her hair, threw her on the bed and told her to lay there, indicating it would be over soon. (TT II 32). Appellant laid on top of Holt and covered her mouth when she tried to scream. (TT II 32). Appellant put his penis into Holt's vagina, stopped, pulled out and then "white stuff came out of [Appellant's penis] and on to [Holt's] leg." (TT II 32). Appellant got dressed, apologized, said he would never do it again and then left for work. (TT II 32). Holt washed up, got dressed and returned to her homework. (TT II 32). When asked if she lived at the same house during the "last time" as the "first time," Holt replied that "it [was] where [she] just lived with [Appellant], 3809 Nestle Street in McKeesport." (TT II 36). Shane testified that Holt never clearly stated that the first rape occurred at Bryant's and the last rape occurred at the Nestle Street residence. (TT II 36). Shane did not attempt to clarify the location of each of the rapes. (TT II 36-37). Holt told Shane that Appellant initially began touching her when she was about nine or ten. (TT II 33). Holt also indicated to Shane that she was scared of Appellant and once he had been incarcerated she felt safe enough to tell her mother about the abuse. (TT II 33). Holt did not disclose to Shane any more than two instances of rape. (TT II 38).

Appellant called Jennifer Bargar, Holt's special education teacher at Sunnyside Elementary in the Pittsburgh Public School District, as a witness. She testified that Holt started school on January 17, 2012. (TT II 47). Holt left Sunnyside on November 26, 2012. (TT II 50). Bargar worked with Holt every day that she was in school. (TT II 51). Bargar was trained as a mandated reporter for child abuse, but Holt never disclosed to Bargar. (TT II 53). Bargar testified, however, that she was not trained to pick up on signs or red flags of child abuse without any form of disclosure. (TT II 56). Despite defense counsel's efforts to portray Holt as requiring Appellant's

strict supervision regarding school attendance and participation, Bargar testified that Holt was a hard working student and always put forth her best effort to learn to read and do well in school. (TT II 54-55). Defense counsel attempted to elicit testimony painting Appellant as a very involved parent, however, Bargar testified that she had very limited contact with him. (TT II 51). Bargar did not typically discuss family life with Holt. (TT II 54). Bargar indicated that her records reflected that, as of January 2012, Holt was living with Alexander on Stanton Avenue and that prior to that date Holt attended Francis McClure Intermediate School in the McKeesport Area School District. (TT II 59-60). Bargar testified that Holt's residences varied over the previous several years. (TT II 60).

Appellant also called Renee Amendola, a guidance counselor at Founder's Hall Middle School in the McKeesport Area School District, who testified that Holt came from Woodland Hills School District in fourth grade and attended Francis McClure, beginning August 25, 2011 until January 19, 2012 and then returned November 26, 2012 until February 27, 2014. (TT II 66-67). School records indicated that Holt did not return to school after Christmas break in January 2014. (TT II 68). Amendola testified that the school looked for Holt "pretty intently." (TT II 68). However, despite best efforts, school officials were unable to locate Holt. (TT II 73).[9] Again, despite counsel's efforts to paint Holt as a troubled child, Amendola had no such information.

Roxanne Alexander, Appellant's girlfriend at the time of trial, testified that she started dating Appellant in October 2011 when he was residing at Bryant's house in McKeesport. (TT III 29-30). Alexander was introduced to Holt in October 2011 and Holt lived with Alexander from January 2012 to November 2012. (TT III 30). Alexander testified that while Holt lived with her, Appellant stayed with his sister in Homewood and then with his mother. (TT III 31, 33). Appellant and his girlfriend at the time, Bryant, had just split up and Alexander offered to let Holt stay with her. (TT III 32). Alexander testified that Appellant's sister's house did not have room for Holt. (TT III 63). Sometimes Appellant visited Alexander and Holt at Stanton Avenue and other times Alexander and Holt went to Appellant's sister's house to visit. (TT III 33). Appellant never stayed the night at Alexander's residence. (TT III 33). Appellant and Holt had regular telephone conversations. (TT III 34). Alexander testified that her relationship with Holt had its "good and bad days." (TT III 33).

In November 2012, Alexander moved to Nestle Street with Appellant and Holt, but kept her Stanton Avenue apartment. (TT III 37-38). Nobody else lived in the Nestle Street residence. (TT III 38).

The house on Nestle Street had two bedrooms. (TT III 38-39). Appellant and Alexander shared a bedroom and Holt had her own. (TT III 39). Alexander testified that Appellant, at the time, was doing "odd jobs." (TT III 39). When Holt returned from school each day, Alexander was always home because she did not work. (TT III 34, 39). Alexander testified that 24 hours a day, seven days a week during the period of time she, Appellant and Holt resided at Nestle Street, Appellant was never home alone with Holt. (TT III 70). Alexander testified that she stayed at Nestle Street Monday through Friday and then returned Sunday. (TT III 41). Alexander went back to her apartment on the weekends and testified that "every weekend," she took Holt with her. (TT III 41). According to Alexander, Appellant went out with his friends on the weekends while she cared for Holt. (TT III 42, 71). Also, according to Alexander, the Nestle Street residence did not have a washer or dryer so she would either go to the Laundromat or to a family member's house to do the laundry. (TT III 39-40). Holt helped Alexander sometimes but Appellant never did the laundry. (TT III 40, 67). Alexander testified that she never noticed any blood on Holt's bed spread, sheets or clothing. (TT III 40). However, Alexander admitted that she did not regularly check Holt's underwear. (TT III 68).

According to Alexander, Holt had a 9p.m. curfew and if she was not in the house by nine she would be "on punishment." (TT III 43). Alexander stated that Appellant was "pretty strict" with Holt. (TT III 43). Holt also had chores to complete. (TT III 63). According to Alexander, she lived at the Nestle Street residence with Appellant and Holt for at least a year, but Alexander never made any legal changes to her tax information or driver's license to show that Nestle Street was her residence. (TT III 64). Alexander's primary residence remained on Stanton Avenue. (TT III 65).

Alexander testified that Appellant and Holt talked on the phone every day when Appellant was incarcerated. (TT III 45). Alexander stated that at first, after Appellant was incarcerated, she did not notice changes in Holt, but she began noticing some around the middle of either November or December. (TT III 45-46). By early December, Holt was spending weekends with her mother. (TT III 49). Alexander testified that Holt asked if they were going to send anything to Appellant for Christmas, so Alexander purchased a card at the Family Dollar for Holt to send to Appellant. (TT III 50). Holt wrote a note in the card which read, in part, "I know at this time I don't show it, but I do love you. I act the way I do because I never forgave the person who hurt me ... " (TT III 51-52). Alexander testified that Holt never disclosed to her anything about Appellant

raping her nor did she ever witness Appellant touch Holt inappropriately. (TT III 54, 56).

Holt's mother, Angela Blackman, testified that between 2011 and 2013 she did not have legal custody of Holt but visited her. (TT III 146). According to Blackman, Alexander was never present when she retrieved Holt from Appellant's custody between August 2012 and February 2013. (TT III 146, 149). On these occasions, Blackman either picked Holt up from a mutual friend, Jason Stenhouse's home, Appellant's mother's home or Appellant's sister's home. (TT III 148-149). Blackman estimated that more than half of the time, she did not observe any other person present when she picked Holt up from Appellant's custody. (TT III 147-148, 151). Blackman never picked Holt up from McKeesport. (TT III 153). Blackman testified that she had never picked Holt up from Alexander's residence and was unfamiliar with the Nestle Street residence. (TT III 152-153).

Appellant testified that Holt is his biological daughter. (TT III 112). Counsel stipulated that Appellant was paroled from Gateway Braddock, a half-way house where he was permitted to have day passes, in March 2011. (TT III 78-79). After leaving Gateway Braddock, Appellant lived in Wilkinsburg, then, in June 2011, moved in with Bryant, the woman he was dating prior to being incarcerated. (TT III 79). Appellant testified that Holt's mother was also incarcerated for a period of time, but visited Holt after she was paroled. (TT III 91). While Appellant was incarcerated, he did not communicate with Holt nor did he know where Holt was or who she was living with. (TT III 114). Prior to Appellant's initial period of incarceration, Holt lived with her mother in Wilkinsburg. (TT III 115-116).

After being paroled, Appellant visited Holt in the Rankin Projects where she was staying with her mother's cousin, Ashley Marshall. (TT III 80, 82, 89). Appellant testified that he spoke with the faculty of Edgewood Primary School in Woodland Hills School District, where Holt had supposedly attended school while living with Marshall, and they informed him they had no record of Holt's attendance for at least a year and a half, placing her in the third grade at age ten. (TT III 89-90). Appellant testified that after he moved in with Bryant, he initiated a complaint to obtain legal custody of Holt. (TT III 82-83). Appellant claimed he officially obtained legal custody of Holt in June 2011. (TT III 84). CYF representatives came to Bryant's house to ensure that the living conditions were adequate and spoke with Holt, Bryant, and Appellant. (TT III 84). Appellant's parole officer also frequently showed up unannounced at Bryant's home. (TT III 140). After being paroled, Appellant was on public

assistance. (TT III 122-123). Appellant agreed that he likely received an increase in public assistance after obtaining custody of Holt. (TT III 123). Appellant testified that after Holt moved in to Bryant's house, he enrolled her at Francis McClure Elementary School. (TT III 85). Counsel stipulated that Holt was enrolled at Francis McClure on August 25, 2011. (TT III 85). Founder's Hall is the new name for Francis McClure. (TT III 85). Bryant worked as a taxi driver and Appellant testified that he worked every weekday and some weekends from 7a.m. to 7 p.m. at a pipe shipping company. (TT III 87, 118). When Bryant drove her taxi on the weekends she dropped Appellant and Holt off in Wilkinsburg at Appellant's mother's house. (TT III 118).

Appellant testified that "as long as [he's] been home, [he] and [Holt] have never had time just [Appellant] and [Holt]. There was always someone around." (TT III 119). There were times when Bryant went to work and Appellant and Holt remained at Bryant's house. (TT III 120). However, Appellant testified that Bryant's uncle lived with them at Bryant's house. (TT III 120). Although Appellant testified that he and Holt were never completely alone in the house, he admitted to times when he was alone with Holt in a room inside of the house. (TT III 143). Appellant stated that he and Bryant had an open relationship. (TT III 87).

Appellant began seeing Alexander before he moved out of Bryant's house. (TT III 124). Appellant and Bryant starting having issues as far as "her dating people and [him] dating people." (TT III 92). Alexander and Appellant started dating in October 2011. (TT III 93). Appellant moved out of Bryant's house and went to stay with his cousin, who he calls "Aunt Vita." (TT III 94). Holt remained living with Bryant for some time until Appellant arranged for her to live with Alexander in her Stanton Avenue apartment. (TT III 94-95). Appellant did not live with Holt in Alexander's home on Stanton Avenue because he did not want to be disrespectful to Alexander's adult children, who were his nieces and nephews, and because there was no room for him in the apartment. (TT III 95-96, 125). While living with Alexander, Holt shared a bedroom with her and the two of them slept in the same bed. (TT III 129). Appellant did not want Holt to live with him at his sister's house in Homewood because the schools were "terrible." (TT III 128). Appellant testified that he never stayed the night at Alexander's home. (TT III 96-97). Appellant enrolled Holt at Sunnyside Elementary in January 2012 using Alexander's Stanton Avenue address. (TT III 93,127).

Appellant procured a home on Nestle Street and Alexander and Holt moved in shortly thereafter. (TT III 97, 131). While living on Nestle Street, Appellant admitted he did not have steady employment. (TT

III 97). Appellant testified that Alexander stayed at the house during the weekdays and took Holt with her to her apartment on the weekends. (TT III 97-98). On the weekends, Appellant was "either in Penn Hills, over [his] uncle's or [he'd] just be out and about, like just living life basically. [He's] still young, so [he] would be out." (TT III 98). Appellant stated that Holt and Alexander visited him at his uncle's on some weekends. (TT III 98).

The Nestle Street residence did not have a washer and dryer and according to Appellant, he never did the laundry. (TT III 99-100). Alexander either went to Penn Hills or to the nearby Laundromat to do the laundry. (TT III 100). Appellant claimed he was strict with Holt. (TT III 109). Appellant testified that Holt had a phone with limited capabilities and no internet access while residing with him. (TT III 107-108). Appellant did not allow Holt on Facebook and she never had a computer or a television in her bedroom. (TT III 108). Appellant adamantly denied raping Holt at the Nestle Street residence and inappropriately touching Holt at Bryant's house. (TT III 100).[10]

After Appellant was incarcerated for DUI on October 26, 2013, Appellant testified that he spoke to Holt almost every day while Holt was living with Alexander. (TT III 101, 135). Appellant did not speak to Holt over the phone when she was with her mother. (TT III 135). Appellant received a Christmas card from Holt at the Allegheny County Jail. (TT III 102). Appellant opined that, in the text of the Christmas card, when Holt referred to "the person who hurt her" she was referring to her mother. (TT III 102).

[9] Amendola testified that she had no personal knowledge as to why Holt stopped attending school in January 2014. (TT II 71).

[10] When asked on cross examination if Appellant was a good father to Holt "when [Appellant] put [his] fingers into Holt's vagina and had sex with her," the record notes that Appellant responded with a smile on his face. (TT III 138-139).

Trial Ct. Op. dated Aug. 3, 2016, at 3-15.

The Pennsylvania Superior Court adopted this factual recitation in its Memorandum on direct appeal. Com. v. Holt, Nos. 1558 WDA 2015 and 1268 WDA 2016, 2017 WL 6169102, at *2 (Pa. Super. Ct. Dec. 8, 2017). It ordered the parties to attach pages 2-22 of the trial court's opinion to its Memorandum "in the event of further proceedings in this matter." Id. at n.3.

## II. RELEVANT PROCEDURAL HISTORY

### A. Proceedings in State Court

Petitioner waved his right to a jury trial on May 18, 2015, after signing a form and undergoing an oral colloquy by the trial court. ECF No. 32-10; see also Trial Tr. dated May 18, 2015, vol. 1, at 4-13. Petitioner's bench trial took place over two days on May 18 and June 9, 2015. Id. at 1; Trial Tr. dated May 18, vol. 2, at 1; Trial Tr. dated June 9, 2015, at 1. He was convicted of the above-recited crimes at a hearing that took place on June 17, 2015. Hr'g Tr. dated June 17, 2015, at 3. He was sentenced on September 9, 2015. Sentencing Tr. dated Sept. 9, 2015, at 2. His sentence included both the above-recited term of imprisonment, as well as a lifetime requirement to register as a sex offender. Id. at 22-24. See also ECF No. 32-14.

Petitioner was represented by then-attorney Scott Westcott both at trial and during sentencing. However, on September 9, 2015 – the same date that he was sentenced – the state trial court granted his motion to withdraw, and appointed the Public Defender to represent Petitioner. ECF No. 32-15.

On July 29, 2016, after a hearing at which he was represented by a public defender, Petitioner was classified as a sexually violent predator. SVP Hr'g Tr. dated July 29, 2016, at 29. See also ECF No. 32-24.

Petitioner timely filed a notice of direct appeal of his conviction and sentence on October 8, 2015. ECF No. 32-18. See also Docket, Com. v. Holt, No. 1558 WDA 2015 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1558%20WDA%202015&dnh=mYia7g8kIajoiflCGcFw6w%3D%3D (last visited Sept. 9, 2026)). He raised the following claims in this direct appeal.

> 1. Did the Commonwealth present insufficient evidence to establish that Appellant committed the crime of Forcible Rape, 18 Pa.C.S. §

> 3121(a)(1–2), given its failure to prove that he compelled [the minor female victim] to engage in sexual intercourse with him either via force or via the threat of force?
>
> 2. Did the Commonwealth present insufficient evidence to establish that Appellant communicated with [the minor female victim] in a way, and for a purpose, prohibited by the Unlawful Contact statute, 18 Pa.C.S. § 6318(a)(1), and, if it did, did it present evidence sufficient to establish the crime rose to the level of a first degree felony?
>
> 3. Was Appellant's waiver of his jury trial right invalid due to his ignorance of the fact that his Trial Counsel's advice to waive should be treated with skepticism given his own past criminal record indicating a decided lack of good judgment (with the failure to file a Post–Sentence Motion including such a claim not precluding review of this claim on the merits)?

Holt, 2017 WL 6169102, at *1-2. See also ECF No. 32-30 at 9-10.

Likewise, Petitioner filed a timely notice of appeal from his designation as a sexually violent predator on August 25, 2016. ECF No. 32-26. See also Docket, Com. v Holt, No. 1268 WDA 2016 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1268%20WDA%202016&dnh=FFjf4UvV2QqLd%2B6TtYGaXw%3D%3D (last visited Sept. 9, 2026)). It that appeal, he raised the following issue.

> Was the order of the Allegheny County Court of Common Pleas deeming Appellant to be a Sexually Violent Predator (SVP) an unlawful order, void ab initio, given that the court was without subject matter jurisdiction (having already imposed a sentence upon Appellant)?

Holt, 2017 WL 6169102, at *2. See also ECF No. 32-34 at 8.

On October 3, 2016, the Pennsylvania Superior Court *sua sponte* listed both direct appeals consecutively before the same panel. See Docket, Holt, No. 1558 WDA 2015; see also Docket, Holt, No. 1268 WDA 2016. It addressed both appeals in a single Memorandum, issued on December 8, 2017, in which it affirmed the trial court on all of the issues raised by Petitioner. Holt, 2017 WL 6169102, at *1-2. However, based on intervening case law, the Superior Court

vacated the order designating Petitioner as a sexually violent predator, and "remand[ed] this case to the trial court for the sole purpose of issuing the appropriate notice to Appellant under 42 Pa.C.S. § 9799.23 that he is required to register [as a sex offender] for life." Id. at *3. At the conclusion of its Memorandum, the Superior Court explicitly held that Petitioner's "[j]udgment of sentence [was] affirmed in all other respects." Id. The record does not indicate that Petitioner sought leave to appeal from the Pennsylvania Supreme Court. The trial court entered the required order on February 1, 2018. ECF No. 32-39 at 1 (dated January 31, 2018, in the text of the order, but time-stamped February 1, 2018).[5] See also Com. v. Holt, No. 536 WDA 2019, 2020 WL 398594, at *1 (Pa. Super. Ct. Jan. 23, 2020).

Petitioner timely submitted a *pro se* first petition for post-conviction relief pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541 et seq. ECF No. 32-40. Although it was received by the trial court on May 22, 2018, it appears to be entitled to an effective filing date of May 11, 2018. Id. at 1 and 20. See also Com. v. Little, 716 A.2d 1287, 1288-89 (Pa. Super. Ct. 1998) (applying the so-called "prisoner mailbox rule" to *pro se* PCRA petitions). Counsel was appointed, who filed an amended first PCRA petition on August 27, 2018. ECF No. 32-41 at 1.

With leave of court, ECF No. 32-45 at 1, Petitioner submitted a second amended first PCRA petition on November 26, 2018, in which he raised the following claims.

> [1.] TRIAL COUNSEL WAS INEFFECTIVE BY MAKING MATERIAL MISREPRESENTATIONS WHICH INDUCED AND CULMINATED IN AN UNKNOWING, UNINTELLIGENT AND INVOLUNTARY WAIVER A JURY [TRIAL.]

---

[5] There are multiple instances in this case in which a date in the body of an order issued by the trial court does not match the date on the filing stamp. This Court interprets the date on the filing stamp to be controlling.

> [2.] TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO LOCATE, INTERVIEW AND CALL AT TRIAL A MATERIAL AND EXCULPATORY WITNESS[.]

ECF No. 32-46 at 9 and 13.

The first PCRA trial court held a hearing on March 15, 2019, and which testimony was taken from Petitioner, his attorney at trial, Petitioner's mother, Roxanne Alexander, and the prosecutor at trial. PCRA Hr'g Tr. dated Mar. 15, 2019, at 1-2. The trial court denied PCRA relief on the same day. ECF No. 32-48 at 1.

Petitioner filed a notice of appeal to the Superior Court on April 12, 2019. ECF No. 32-49 at 1. See also Docket, Com. v. Holt, No. 536 WDA 2019 (Pa. Super. Ct) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=536%20WDA%202019&dnh=TTrGIypCkNLfQ9g4u2gsKQ%3D%3D (last visited Sept. 9, 2026)). In his appeal brief, he raised the following issues.

> 1. Whether the [PCRA] court erred in dismissing [Holt's] second amended PCRA petition by not finding and ruling that [Holt] did not make a knowing, intelligent and voluntary waiver of his right to a jury trial due to trial counsel's misrepresentations?
>
> 2. Whether the [PCRA] court erred in dismissing [Holt's] second amended PCRA petition by not finding and ruling that [Holt's] trial counsel was ineffective due to failing to locate, interview and call [Holt's] mother as a witness?

Holt, 2020 WL 398594, at *1. See also ECF No. 32-54 at 9.

On January 23, 2020, in a Memorandum that paralleled its decision in Petitioner's direct appeal, the Superior Court affirmed the first PCRA trial court's denial of post-conviction relief, id., but *sua sponte* vacated the order requiring Petitioner to register as a sex offender, id. at *7. The case was remanded to the trial court "for the imposition of [sex offender registration] requirements under Subchapter I [of Pennsylvania's sex offender registration law]." Id. Petitioner sought leave to appeal from the Pennsylvania Supreme Court, but *allocatur* was denied on July

10, 2020. Com. v. Holt, No. 59 WAL 2020, 2020 WL 3887406, at *1 (Pa. July 10, 2020). The record does not indicate that Petitioner sought a writ of *certiorari* from the United States Supreme Court.

Petitioner was resentenced on September 11, 2020, to correct Petitioner's sex offender reporting requirements, ECF No. 32-61 at 1. After the filing of post sentence motions, ECF No. 32-62, the trial court issued an amended sentencing order on September 30, 2020, and backdated it to September 11, 2020. ECF No. 32-64 at 1-2.

Petitioner filed a notice of appeal with the Superior Court on October 26, 2020, but moved to withdraw it on November 18, 2020. Docket, Com. v. Holt, No 1149 WDA 2020 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1149%20 WDA%202020&dnh=J1Oyw6vCjLc2K650I%2BAN5A%3D%3D (last visited Sept. 9, 2026)). The Superior Court granted the motion to withdraw the appeal on November 20, 2020. Id.

On April 1, 2021, the trial court ordered the prosecution to answer a second PCRA petition. ECF No. 32-70. For reasons that are unclear, that second PCRA petition never was filed on the state court docket, and does not appear in the official state court record.[6] The prosecution appears to have had a copy of the second PCRA petition, and filed an answer on April 22, 2021, in which it requested that Petitioner be allowed to file an amended second PCRA petition "to include the merits of his claims[.]" ECF No. 32-71 at 1 and 3. The trial court ordered Petitioner to do just that on May 7, 2021. ECF No. 32-72 at 1. Petitioner appears to have submitted something in response to this Order on June 1, 2021 – however, it, too, never was filed on the docket. See ECF

---

[6] Petitioner attaches what he purports to be the second PCRA petition, dated March 25, 2021, as an exhibit to his first amended federal habeas petition in this matter. ECF No. 25-2 at 36-55. He also submits an amended second PCRA petition, dated June 1, 2021, as another exhibit. Id. at 60-71.

No. 32-73 at 12 ("In an Amended petition dated June 1, 2021, but never filed, Petitioner raised his after-discovered evidence claim regarding the disbarment of Scott Westcott, Esquire."). The prosecution filed its second answer on June 30, 2021. Id. at 1.

On July 6, 2021, the trial court issued notice of its intent to dismiss Petitioner's unfiled amended second PCRA petition. ECF No. 32-74 at 1. However, prior to any order of dismissal, Petitioner filed a notice of appeal of appeal dated November 20, 2021. ECF No. 32-75 at 1. Petitioner ultimately withdrew this appeal on March 14, 2022. ECF No. 32-86 at 1 and ECF No. 32-88 at 1. See also Docket, Com. v. Holt, No. 1446 WDA 2021 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1446%20WDA%202021&dnh=gMHjBWcSJ20wwY1%2FVbuY0A%3D%3D (last visited Sept. 9, 2026)).

Thereafter, the Superior Court returned jurisdiction to the trial court. On March 22, 2022 the trial court once again ordered Petition to file an amended second PCRA petition, setting a 30-day deadline. ECF No. 32-89 at 1. The record does not show that Petitioner responded to this order. The trial court dismissed the operative – but undocketed – amended second PCRA petition as untimely on May 17, 2022. ECF No. 32-90 at 1.

Petitioner filed a notice of appeal on June 10, 2022. ECF No. 32-91 at 1. See also Docket, Com. v. Holt, No. 956 WDA 2022 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=956%20WDA%202022&dnh=dlhfhSss4VDIhX9yjGlyKg%3D%3D (last visited Sept. 9, 2026)). Petitioner asserted the following two issues in his appeal brief.

> 1. Is [Appellant] entitled to a new trial or remand for an evidentiary hearing based upon the newly discovered evidence of [Trial Counsel's] disbarment after his first timely PCRA petition was litigated, thus, constituting after-discovered facts. Moreover, [Appellant's] right to fundamental fairness under the due process

> clause of the Fourteenth Amendment was violated by the failure to issue an evidentiary hearing?
>
> 2. Did the PCRA court err when it dismissed [Appellant's] second PCRA petition without a hearing when it concluded that he did not meet the standard set under ***Commonwealth v. Pagan***, 950 A.2d 270 (Pa. 2008)?

Com. v. Holt, No. 956 WDA 2022, 2023 WL 4174184, at *2 (Pa. Super. Ct. June 26, 2023). See also ECF No. 32-96 at 6. The Superior Court denied these issues as waived because Petitioner's second PCRA petition and amended second PCRA petition never were formally docketed by the trial court. Holt, 2023 WL 4174184, at *2. The Superior Court went on to hold that, even had the issues not been waived, Petitioner still would not be entitled to relief on the merits because the asserted evidence did not qualify as a "newly-discovered fact" under state law. Id. at *2-3. The record does not indicate that Petitioner sought leave to appeal from the Pennsylvania Supreme Court.

### B. Federal Habeas Proceeding

The instant federal habeas proceeding commenced with receipt of the initial Petition and Motion for Leave to Proceed *in Forma Pauperis* on September 21, 2020. ECF No. 1. After the initial Petition was formally filed, ECF No. 7, Respondents moved to stay this case on November 12, 2020, due to the pendency of Petitioner's appeal in state court at No. 1149 WDA 2020. ECF No. 9. On December 17, 2020, Petitioner submitted notice that that appeal had been withdrawn. ECF No. 11. On December 22, 2020, the stay was lifted, and Respondents were ordered to answer the initial Petition. ECF Nos. 12 and 13.

On March 30, 2021, before an Answer had been filed, Petitioner filed his own motion to stay this case. ECF No. 19. The basis for the stay was Petitioner's second PCRA petition – which he indicated that he had mailed to the Court of Common Pleas on the same date that he had mailed his motion to stay. Id. at 7. This Court granted a second stay on March 31, 2021. ECF No. 20.

Petitioner filed a status report providing notice that his second PCRA proceeding had been completed on July 14, 2023. ECF No. 23 at 1. In the status report, Petitioner indicated his intention to submit an amended federal habeas petition as well. Id. Accordingly, this Court lifted the stay and set a deadline for the filing of the amended petition. ECF No. 24.

Petitioner submitted his first Amended Petition on October 17, 2023. ECF No. 25. However, the first Amended Petition was deficient in that it included only one claim, which related only to Petitioner's second PCRA proceeding, and was intended to supplement his initial Petition. Id. at 2 and 7. Accordingly, Petitioner was ordered to file a new amended petition asserting all of the grounds for federal habeas relief that he wished to raise. ECF No. 27. Petitioner complied with that Order, and filed the operative Second Amended Petition on November 20, 2023. ECF No. 28.

Petitioner asserts the following grounds for federal habeas relief.

GROUND ONE: DOES THE EVIDENCE THAT MR. HOLT RELIED ON IN HIS SECOND PCRA PETITION CONSTITUTE "NEW EVIDENCE" THAT WOULD DEMONSTRATE THAT NO REASONABLE FACT FINDER WOULD HAVE CONVICTED HIM IN LIGHT OF THE NEW EVIDENCE (I.E., THE DISBARMENT OF MR. WESTCOTT, ESQ., DEMONSTRATING HIS DISHONESTY TO THE COURT AND HOW HE LIED ABOUT MAKING PROMISES TO MR. HOLT IF HE WAIVED HIS JURY RIGHT AND PROCEED WITH A BENCH TRIAL.)?

GROUND TWO: THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE PETITIONER COMMITTED THE CRIME OF: (A) FORCIBLE RAPE (B) UNLAWFUL CONTACT BEYOND A REASONABLE DOUBT.

GROUND THREE: DID THE TRIAL COURT ERR FINDING THAT THE PETITIONER KNOWINGLY AND INTELLIGENTLY WAIVED A TRIAL BY JURY?

GROUND FOUR: THE TRIAL COURT ERRED NOT RULING THAT THE PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE WHERE COUNSEL FAILED TO LOCATE, INTERVIEW AND

SUBSEQUENTLY CALL THE PETITIONER'S MOTHER AS A WITNESS.

GROUND FIVE: WAS TRIAL COUNSEL INEFFECTIVE WHEN HE MISREPRESENTED TO THE PETITIONER THAT THE PETITIONER'S CASE WOULD BE DISMISSED IF THE PETITIONER WAIVED A TRIAL BY JURY; FURTHERMORE, COUNSEL LACKED CANDOR TO THE PCRA COURT WHEN ASKED ABOUT THE FOREGOING MISREPRESENTATION.

GROUND SIX: WAS TRIAL COUNSEL INEFFECTIVE WHERE COUNSEL FAILED TO DO AN INDEPENDENT INVESTIGATION, BUT INSTEAD, MERELY USED THE PROSECUTION'S FILE AS A SUBSTITUTE FOR AN INVESTIGATION?

GROUND SEVEN: WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO DISCUSS THE IMPORTANCE OF CHARACTER WITNESSES UNDER THE CIRCUMSTANCES OF THE PETITIONER'S CASE?

ECF No. 28-1 at 4, 18, 22, 26, 29, 32, 38 (emphasis added to Ground One for consistency; renumbered as in the Answer, ECF No. 32 at 37-38, and Traverse, ECF No. 37).

Respondents answered the Second Amended Petition on December 21, 2023. ECF No. 32. Petitioner submitted his Traverse on April 18, 2024. ECF No. 37. The Second Amended Petition is ripe for consideration.

## III. AEDPA PROCEDURAL REQUIREMENTS

Before this Court addresses the merits of Petitioner's federal habeas claims, it will address whether the Petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

### A. The AEDPA Statute of Limitations

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations. In 1996, Congress enacted the AEDPA, which generally established a strict one-year statute of limitations for the filing habeas petitions pursuant to 28 U.S.C. § 2254. The applicable portion of the statute is as follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of limitations set out in Section 2244(d) must be applied on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067 (2005). Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine

whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented. See, e.g., Munchinski v. Wilson, 807 F. Supp. 2d 242, 263 (W.D. Pa. 2011), aff'd, 694 F.3d 308 (3d Cir. 2012) (citing Nara v. Frank, No. 99-5, 2004 WL 825858, at *3 (W.D. Pa. Mar. 10, 2004)).

In the instant case, Respondents concede that the Second Amended Petition is timely. ECF No. 32 at 35. After review of the record, the undersigned agrees. This case is timely-filed.

**B. Exhaustion and Procedural Default**

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.

To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review. See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). To fairly present a claim, "[b]oth the legal theory and facts underpinning the federal claim must have been presented to the state courts." Evans v. Court of Common Pleas, Delaware Cnty., 959 F.2d 1227, 1231 (3d Cir. 1992).

Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court, and highest available court before exhaustion will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004). A petitioner shall not be deemed to have exhausted state

remedies if he or she has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). The petitioner has the burden of establishing that the exhaustion requirement has been met. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987). In the case at bar, it is clear that Petitioner's claims are exhausted at the state court level at the very least in the sense that there is no state avenue for relief available due to the PCRA's one-year statute of limitations. See 42 Pa. C.S.A. § 9545(b).

However, beyond the question of exhaustion, a federal court may be precluded from reviewing habeas claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996). This doctrine is applicable where, *inter alia*, a petitioner's claims are "deemed exhausted because of a state procedural bar[.]" Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system. In turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman, 501 U.S. at 750.

The PCRA's one-year statute of limitations has been held to be an "independent and adequate" state law ground for denying habeas relief. Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002). So too has the requirement under 42 Pa. C.S.A. § 9544(b) that "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." Garcia v. Adams, No. 17-CV-5249, 2019 WL 8015127, at *6 (E.D. Pa. Aug. 27, 2019), report and recommendation adopted, 2020 WL

868200 (E.D. Pa. Feb. 20, 2020), aff'd sub nom. Garcia v. Sup't Forest SCI, No. 20-1570, 2022 WL 1153122 (3d Cir. Apr. 19, 2022) (citing cases). Additionally, waiver due to a petitioner's failure to recite a claim in a "statement of questions" section in a state court appeal brief has been held to be independent and adequate ground for procedural default Stringer v. Folino, No. 13-221, 2016 WL 836347, at *13-14 and n.16 (W.D. Pa. Feb. 1, 2016) (citing Pa. R.A.P 2116(a)), report and recommendation adopted, 2016 WL 826016 (W.D. Pa. Mar. 3, 2016).

Here, Respondents concede that Ground Two through Ground Five were exhausted, and not defaulted, in the state courts. ECF No. 32 at 40-41. However, they argue that Grounds One, Six, and Seven were procedurally defaulted. Id. at 40-41.

At Ground One, Petitioner asserts the following claim.

> GROUND ONE: DOES THE EVIDENCE THAT MR. HOLT RELIED ON IN HIS SECOND PCRA PETITION CONSTITUTE "NEW EVIDENCE" THAT WOULD DEMONSTRATE THAT NO REASONABLE FACT FINDER WOULD HAVE CONVICTED HIM IN LIGHT OF THE NEW EVIDENCE (I.E., THE DISBARMENT OF MR. WESTCOTT, ESQ., DEMONSTRATING HIS DISHONESTY TO THE COURT AND HOW HE LIED ABOUT MAKING PROMISES TO MR. HOLT IF HE WAIVED HIS JURY RIGHT AND PROCEED WITH A BENCH TRIAL.)?

ECF No. 28-1 at 4.

Respondents' argument here is curious, because they later assert that the issue was addressed on the merits by the Superior Court, and that AEDPA deference pursuant to 28 U.S.C. § 2254(d) should apply. ECF No. 32 at 44-45. However, for reasons that will become apparent in Part IV.A, infra, the undersigned will decline to address the issue of procedural default with respect to Ground One, presume that *de novo* review applies, and address it on the merits pursuant to 28 U.S.C. § 2254(b)(2).

At Grounds Six and Seven, Petitioner raises the following claims.

GROUND SIX: WAS TRIAL COUNSEL INEFFECTIVE WHERE COUNSEL FAILED TO DO AN INDEPENDENT INVESTIGATION, BUT INSTEAD, MERELY USED THE PROSECUTION'S FILE AS A SUBSTITUTE FOR AN INVESTIGATION?

GROUND SEVEN: WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO DISCUSS THE IMPORTANCE OF CHARACTER WITNESSES UNDER THE CIRCUMSTANCES OF THE PETITIONER'S CASE?

ECF No. 28-1 at 39 and 46. Because these claims involve alleged ineffective assistance of trial counsel, they properly would have been raised in Petitioner's first PCRA proceeding. Com. v. Grant, 813 A.2d 726, 738 (Pa. 2002) ("as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review,") abrogated in part on other grounds, Com. v. Bradley, 261 A.3d 381 (Pa. 2021)). He may not raise them in state court now. 42 Pa. C.S.A. §§ 9544(b) and 9545(b). They are procedurally defaulted.

But this does not end the inquiry into whether this Court may address the merits of Grounds Six and Seven.

The United States Supreme Court has held that where a petitioner has to failed to follow state procedure within the required time period, the "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[7] Coleman, 501 U.S. at 750; see also Wainwright v. Sykes,

[7] In order to show a fundamental miscarriage of justice, the United States Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 321 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). But "[i]t is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." See Bousley v. United States, 523 U.S. 614, 623 (1998). Here, to the extent that Petitioner relies on Ground One as a basis for miscarriage of justice exception, the "new evidence" asserted therein – that Petitioner's attorney at his trial and (continued . . .)

433 U.S. 72, 86-87 (1977) (failure to follow state's procedural rules results in procedural default, which bars federal review of petitioner's claims unless he can show cause and prejudice); Hull v. Freeman, 991 F.2d 86, 90-91 (3d Cir. 1993) (same). The Court in Coleman further recognized "the important interest in finality served by state procedural rules and the significant harm to the States that results from the failure of federal courts to respect them." 501 U.S. at 750.

The Supreme Court has defined "cause" as "some objective factor external to the defense." Murray v. Carrier, 477 U.S. 478, 488 (1986). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials" are two examples, but not an exhaustive list. Id. It is the petitioner's burden to show that procedural default should be set aside. See Bousley, 523 U.S. at 621. See also Colman, 501 U.S. at 750; see also Sweger v. Chesney, 294 F.3d 506, 520 (3d Cir. 2002).

In his operative pleadings, Petitioner relies on the holding of the United States Supreme Court in Martinez v. Ryan, 566 U.S. 1 (2012), to establish cause to set aside his procedural default. ECF No. 28-1 at 12; ECF No. 37 at 2.

**1. The requirements of Martinez v. Ryan**

There is no federal constitutional right to effective assistance of counsel at state post-conviction collateral proceedings. Shinn v. Ramirez, 596 U.S. 366, 382-83 (2022). As a general rule, a habeas petitioner is responsible for any errors of counsel during such a proceeding. Id. at 382-83. However, in Martinez, the United States Supreme Court created a limited equitable exception to this general rule, where ineffective assistance of post-conviction counsel can establish cause to set aside the default of a "a substantial claim of ineffective assistance at trial[.]" 556 U.S.

---

initial sentencing in 2015, Scott Westcott, was disbarred on consent in September of 2019 due to conduct unrelated to Petitioner or his trial, see ECF No. 32-98 at 5-31 – it is insufficient to show factual innocence of any of the crimes of which he was convicted.

at 17. The Martinez exception applies only under specific circumstances where post-conviction counsel is ineffective for failing to raise such a claim on collateral review. As this Court has previously explained:

> The decision of the United States Supreme Court in Martinez v. Ryan created a sea change in the doctrine of procedural default, holding for the first time that a claim of ineffective assistance of post-conviction relief counsel could serve as cause to excuse the procedural default of a claim of trial counsel's ineffectiveness. However, the Supreme Court in Trevino v. Thaler, 133 S.Ct. 1911, 1918 (2013) explained that Martinez only permits a federal habeas court to find "cause" based on post conviction counsel's ineffectiveness and "thereby excus[e] a defendant's procedural default, where (1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

Taylor v. Pennsylvania, No. 15-1532, 2018 WL 446669, at *9 (W.D. Pa. Jan. 16, 2018). A claim is "substantial" when it has "some merit," analogous to the standard for a certificate of appealability. Martinez, 566 U.S. at 14. See also Cox v. Horn, 757 F.3d 113, 119 (3d Cir. 2014).

**2. Petitioner is limited to the state court record.**

In Shinn, the United States Supreme Court limited the Martinez exception significantly when it announced that it does not permit a federal court to dispense with the narrow limits on considering new evidence set forth in 28 U.S.C. § 2254(e)(2). Shinn, 596 U.S. at 371.

28 U.S.C. § 2254(e)(2) recites:

> (2) If the applicant ***has failed to develop the factual basis of a claim in State court proceedings***, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; ***and***
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, ***no reasonable factfinder would have found the applicant guilty of the underlying offense***.

(emphasis added).

A petitioner is at fault, and thus responsible for failing to develop the record in state court, even if that failure is due to the negligence of his state post-conviction counsel. Shinn, 596 U.S. at 382 (quoting Williams v. Taylor, 529 U.S. 420, 432 (2000)). This is consistent with the general rule that a petitioner bears the responsibility for all state post-conviction attorney errors because there is no federal constitutional right to counsel in state post-conviction proceedings. Id. at 382-83 (citing Coleman, 501 U.S. at 754 and Davila v. Davis, 582 U.S. 521, 528 (2017)).

Although Martinez recognized an equitable exception to the doctrine of procedural default, the Supreme Court in Shinn concluded that it had no power to redefine when a prisoner "has failed to develop the factual basis of a claim in State court proceedings" under the meaning of the statute. Shinn, 596 U.S. at 381 (quoting 28 U.S.C. § 2254(e)(2)). Thus, the requirements of Section 2254(e)(2) must be satisfied before a federal court may hold an evidentiary hearing or otherwise consider new evidence on the merits of a defaulted ineffective assistance of trial counsel claim. Id. at 388-89.

Additionally, because a hearing on cause and prejudice under Martinez would serve no purpose if the evidence developed therein could not be considered on the merits of the claim, a federal court may not hold an evidentiary hearing or otherwise consider new evidence to assess

cause and prejudice under Martinez unless a petitioner meets the requirements of Section 2254(e)(2). Id. at 387-89.

After Shinn, the United States Court of Appeals for the Third Circuit issued its decision in Williams v. Superintendent Mahanoy SCI, 45 F.4th 713 (3d Cir. 2022), which further underscored the strict application of Section 2254(e)(2) to new evidence. In Williams, the Third Circuit held that a petitioner may not develop the facts to support a claim of ineffective assistance of trial counsel in an evidentiary hearing in federal court where his state post-conviction counsel negligently had failed to develop the factual basis for the claim in state court, unless he satisfies Section 2254(e)(2). Id. at 723 (citing Shinn, 596 U.S. at 383-84). Further, the Third Circuit concluded that, under Shinn, expanding the record through depositions or other discovery under such circumstances was prohibited without satisfying the requirements of Section 2254(e)(2). Williams, 45 F.4th at 724 (citing Shinn, 596 U.S. at 389). See also Holland v. Jackson, 542 U.S. 649, 653 (2004) (per curiam) (the Section 2254(e)(2) restrictions "apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing") (emphasis in original).

In short, where a petitioner is at fault for failing to develop the factual basis for his underlying constitutional claim on the merits in state court and cannot satisfy Section 2254(e)(2)'s exceptions, a federal court "must skip hearings altogether and deny habeas relief unless the prisoner prevails on the merits considering only the state court record." Williams, 45 F.4th at 723-24. If a petitioner under such circumstances cannot succeed on the underlying constitutional claims of ineffective assistance of trial counsel on the closed state court record, "federal courts should deny relief without more." Id. at 724.

Here, the factual bases underlying Grounds Six and Seven are not newly-discovered. To the contrary, they appear to have been asserted by Petitioner in his *pro se* first PCRA petition. See

ECF No. 32-40 at 4. But Petitioner's *pro se* petition was supplanted by his counseled amended first PCRA petition, ECF No. 32-42, and second amended first PCRA petition, ECF No. 32-46, in which these claims were not raised. Further, Petitioner does not argue that he is not at fault for failing to develop them on the state court record. Moreover, neither Ground Six nor Ground Seven is based on a new rule of constitutional law made retroactive by the United States Supreme Court. This Court is constrained to find that Petitioner is at fault for his PCRA counsel's failure to raise these grounds in his first PCRA proceeding, and there is no indication that any of the exceptions set forth in Section 2254(e)(2) apply to this case. Therefore, Petitioner is limited to the state court record to support these claims of ineffective assistance of counsel.

**3. Petitioner has not established a basis to set aside his procedural default of Grounds Six and Seven.**

Under Williams, this Court must analyze the factual merits of Petitioner's grounds for federal habeas relief on the closed state court record before considering whether default may be set aside under Martinez. This Court will apply *de novo* review.

Here, Petitioner provides little to no argument in his operative pleadings regarding why Martinez would establish cause to set aside his procedural default of Grounds Six and Seven. Presuming that he is relying on the asserted merits of the claims to establish that they are substantial, he fails.

First, with respect to Ground Six, Petitioner asserts that his trial counsel was ineffective because he allegedly failed to conduct an independent investigation, and instead relied on the prosecution's file.[8] ECF No. 28-1 at 32. Specifically, Petitioner asserts that his trial attorney:

- failed to inspect the scenes of the crimes;

[8] The standard for ineffective assistance of counsel is thoroughly recited at Part IV.D, infra.

- failed to interview a witness who allegedly would have attested to Petitioner's innocence;
- failed to investigate medical records or interview medical witnesses; and
- failed to obtain or review Petitioner's employment attendance log.

Id. at 36-37.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990) (citing Strickland v. Washington, 466 U.S. 668, 690-91 (1984)). In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. Kimmelman v. Morrison, 477 U.S. 365, 384, (1986).

Defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation. Lewis, 915 F.2d at 111. As the Supreme Court stated in Strickland,

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See United States v. Decoster, supra, at 372–373, 624 F.2d at 209–210.

Strickland, 466 U.S. at 691.

Here, Petitioner has failed to demonstrate that the state court record supports the conclusion that Ground Six presents a substantial claim. The state court record does not establish: (1) that Petitioner ever informed his trial counsel of this evidence; (2) that trial counsel actually failed to investigate this evidence, see Holt, 2020 WL 398594, at *6 (quoting the first PCRA trial court's opinion on appeal, noting that trial counsel had been "thoroughly prepared for trial"), see also Trial Tr. dated May 18, 2015, vol. 1, at 17-21 (direct and cross examination of prosecution's medical witness); see also Trial Tr. dated May 18, 2015, vol., at 27-39 (examination of forensic interviewer who interviewed the victim on March 5, 2014); or (3) that Petitioner suffered any prejudice due to counsel's alleged omissions with respect to this claim. Cf. Dobson v. United States, No. 13-1711, 2016 WL 4941994, at *4 (D.N.J. Sept. 15, 2016) (citing Duncan v. Morton, 256 F.3d 189, 201-02 (3d Cir. 2001)) (Prejudice resulting from counsel's ineffectiveness "cannot be based on mere speculation about the possibility of finding an expert witness, nor can it be based on mere speculation about the possible testimony.").

The state court record provides nothing upon which Petitioner may base his claim at Ground Six. Accordingly, Petitioner has failed to establish cause under the Martinez exception, and Ground Six will be dismissed as procedurally defaulted.

Similarly, with respect Ground Seven, Petitioner asserts that trial counsel was ineffective for allegedly failing to discuss the importance of character witnesses to Petitioner's case. ECF No. 28-1 at 38. Petitioner argues that he "held a meaningful job, a loving family and numerous friends -- all who would have testified if asked by either the Petitioner or counsel. And, had the testimony be [*sic*] heard, could have probably changed the outcome of the trial." Id. at 39 (emphasis as in original).

Once again, Petitioner has failed to demonstrate that this claim is substantial based on the state court record. The state court record does not indicate who would have testified as a character witness, or what they would have said. Additionally, the trial court colloquied Petitioner regarding calling character witnesses. Trial Tr. dated May 18, 2015, vol.2, at 21-25. While Petitioner initially indicated his intention to call character witnesses, id. at 21, he later stated that he would not after discussing the issue off the record with his attorney, id. at 22. Immediately after retracting his expressed intent to present character testimony, the following exchange took place.

> THE COURT: So you now understand what a character witness is?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And you're telling me that you do not want to call any character witnesses.
>
> THE DEFENDANT. Right. Correct.
>
> THE COURT: All right. And that's a decision that you've made, having a full opportunity to discuss it with Mr. Westcott, but it is your decision, not his?
>
> THE DEFENDANT: Right. Correct.
>
> THE COURT: Okay. And so with regard to your decision here today, you are telling me that you understand your rights, have discussed them with Mr. Westcott and have decided that you do want to testify yourself, but you do not want to call any character witnesses; is that correct?
>
> THE DEFENDANT: Correct.
>
> THE COURT: Any questions, Mr. Westcott?
>
> MR. WESTCOTT: No, Your Honor.
>
> THE COURT: Mr. Hong-Barco?
>
> MR. HONG-BARCO: None, Your Honor. Thank you.
>
> THE COURT: Just briefly, you do understand that a single character witness, if believed by the trier of fact, could raise in the trier of fact reasonable doubt?

> THE DEFENDANT: Okay.
>
> THE COURT: Okay.
>
> THE DEFENDANT: I understand, but okay.
>
> THE COURT: You understand, and you still don't want to call any character witnesses?
>
> THE DEFENDANT: No, ma'am.

Id. at 23-25.

Based on the state court record, Petitioner has failed to demonstrate a substantial claim of ineffective assistance of trial counsel with respect to either deficient performance or prejudice as to Ground Seven. Thus, the Martinez exception does not provide cause to set aside his procedural default of this claim, and it will be dismissed.

Grounds Six and Seven will be dismissed because they are procedurally defaulted, and Petitioner has not met his burden to set aside that default.[9] This Court will address remaining Grounds One through Five on their merits.

## IV. MERITS ANALYSIS OF FEDERAL HABEAS CLAIMS

The AEDPA provides the applicable deferential standard by which a federal habeas court must review the state court's disposition of a claim raised in a federal habeas petition. See 28 U.S.C. § 2254(d) and (e).

---

[9] Petitioner also asserts in his Traverse that this Court should consider the cumulative effect of any error. Even if it were proper for him to raise an additional ground for relief for the first time in his Traverse, Petitioner failed to present such a claim to the Superior Court, and it now would be procedurally defaulted. Collins v. Sec'y of Pennsylvania Dept. of Corrs., 742 F.3d 528, 543 (3d Cir. 2014). See also ECF No. 32-30 at 9-10 (Petitioner's direct appeal brief), ECF No. 32-54 at 9 (Petitioner's first PCRA appeal brief), and ECF No. 32-96 at 6 (Petitioner's second PCRA appeal brief). Petitioner provides no basis to set aside default. Thus, to the extent that Petitioner is attempting to raise a cumulative error claim, it will be dismissed.

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in Section 2254(d), which applies to claims that have been adjudicated on the merits in state court. The Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of . . . clearly established Federal law as determined by the Supreme Court of the United States." Id. at 404-05 (emphasis deleted).

A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court. Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case. Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06).

In addition, the United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'" Dennis v. Sec., Pa. Dep't of Corrs., 834 F.3d 263, 368 (3d Cir. 2016) (quoting Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)). As the Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that

precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Specific factual determinations by the state court that are subsidiary to the ultimate decision to grant post-conviction relief are subject to the presumption of correctness, and must be overcome by Petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). See also Lambert, 387 F.3d at 235-236. The Third Circuit has declined to adopt a "rigid approach to habeas review of state fact-finding." Id. at 236 n.19. If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

It is a habeas petitioner's burden to show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. Ross v. Att'y Gen. of State of Pennsylvania, No. 07-97, 2008 WL 203361, at *5 (W.D. Pa. Jan. 23, 2008). This burden means that Petitioner must point to specific caselaw decided by the United States Supreme Court and show how the state court decision was contrary to or an unreasonable application of such United States Supreme Court decisions. Owsley v. Bowersox, 234 F.3d 1055, 1057 (8th Cir. 2000) ("To obtain habeas relief, Mr. Owsley must therefore be able to point to a Supreme Court precedent that he thinks the Missouri state courts acted contrary to or unreasonably applied. We find that he has not met this burden in this appeal. Mr. Owsley's claims must be rejected because he cannot provide us with any Supreme Court

opinion justifying his position."); West v. Foster, No. 07-CV-00021, 2010 WL 3636164, at *10 n.20 (D. Nev. Sept. 9, 2010) ("petitioner's burden under the AEDPA is to demonstrate that the decision of the Supreme Court of Nevada rejecting her claim 'was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*.' 28 U.S.C. § 2254(d)(1) (emphasis added). Petitioner has not even begun to shoulder this burden with citation to apposite United States Supreme Court authority."), aff'd, 454 F. App'x 630 (9th Cir. 2011).

To the extent that a claim was fairly presented to the state courts but was not addressed on the merits, *de novo* review applies. Cone v. Bell, 556 U.S. 449, 472 (2009). The same review applies to a claim that resulted from a state court decision that was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) and (2).

### A. Ground One does not Provide a Cognizable Basis for Relief.

At Ground One, Petitioner asserts the following.

GROUND ONE: DOES THE EVIDENCE THAT MR. HOLT RELIED ON IN HIS SECOND PCRA PETITION CONSTITUTE "NEW EVIDENCE" THAT WOULD DEMONSTRATE THAT NO REASONABLE FACT FINDER WOULD HAVE CONVICTED HIM IN LIGHT OF THE NEW EVIDENCE (I.E., THE DISBARMENT OF MR. WESTCOTT, ESQ., DEMONSTRATING HIS DISHONESTY TO THE COURT AND HOW HE LIED ABOUT MAKING PROMISES TO MR. HOLT IF HE WAIVED HIS JURY RIGHT AND PROCEED WITH A BENCH TRIAL.)?

ECF No. 28-1 at 4.

The new evidence to which Petitioner refers relates to his trial attorney's disbarment on consent in September of 2019 – after he had testified at Petitioner's PCRA hearing, and well-after representing Petitioner at trial – based on to conduct unrelated to Petitioner or his trial. See ECF No. 32-98 at 5-31.

This Court's ability to grant federal habeas relief is limited to violations of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of error by the PCRA trial court or PCRA Superior Court – such as failing to exercise the state court's inherent powers, or failing to hold a hearing on a PCRA petition – simply are not cognizable in a federal habeas action. See, e.g., Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation.") See also Lambert, 387 F.3d at 247 ("habeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding.")

Accordingly, habeas relief based on error in the PCRA proceedings will be denied.[10]

Further, to the extent that Petitioner raises this as a stand-alone actual innocence claim, it will be denied. There is no recognized free standing actual innocence claim to federal habeas relief. McQuiggin v. Perkins, 569 U.S. 383, 392 (2013). To the extent that one exists, "it would entail an 'extraordinarily high' burden of proof—one so high that no petitioner in our Court nor

[10] Petitioner argues in his Traverse that he does not complain of error at the PCRA court, but instead at his underlying criminal trial. ECF No. 37 at 4. But that is not the argument that he raised to the Superior Court in his second PCRA appeal – which was based explicitly on fundamental fairness in his PCRA proceedings. ECF No. 32-96 at 918, 920, and 925. See also ECF No. 25-2 at 62 (purportedly Petitioner's amended second PCRA petition, which never was docketed in state court, in which Petitioner stated "First, Mr. Holt asserts that the issue herein deals with an error (i.e., Due Process right) that was violated during his 3/15/2019 PCRA hearing on his first one as of right."). To the extent that Petitioner now would construe Ground One to relate to errors at trial, it never was fairly presented to the state courts, and is procedurally defaulted. Evans, 959 F.2d at 1231. Petitioner does not explain why any such default should be set aside.

the Supreme Court has ever met it." Marcy v. Sup't Phoenix SCI, 110 F.4th 210, 219 n.20 (3d Cir. 2024) (internal citations omitted).

For the reasons stated at footnote 7, supra, any stand-alone innocence claim will be denied. See Hill v. Terra, No. 2:14-CV-4574, 2026 WL 1735038, at *6 (E.D. Pa. June 16, 2026) ("Failure to meet the [actual innocence] gateway standard is sufficient to reject any hypothetical freestanding actual innocence claim[,]") (citing Bruce v. Warden Lewisburg USP, 868 F.3d 170, 184 (3d Cir. 2017) and Albrecht v. Horn, 485 F.3d 103, 126 (3d Cir. 2007)).

**B. Ground Two will be Denied.**

At Ground Two, Petitioner asserts the following claim:

> THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE PETITIONER COMMITTED THE CRIME OF: (A) FORCIBLE RAPE (B) UNLAWFUL CONTACT BEYOND A REASONABLE DOUBT.

ECF No. 28-1 at 18. This claim was exhausted in Petitioner's direct appeal by Issue 1 and Issue 2 asserted therein. Holt, 2017 WL 6169102, at *1-2. In its Memorandum, the Superior Court explicitly adopted the reasoning of the state trial court as to these issues. Id. at *2.

The clearly established federal law for analyzing a sufficiency of the evidence claim is set forth in Jackson v. Virginia, where the United States Supreme Court held that "in a challenge to a state conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. 307, 324 (1979). In a federal habeas corpus proceeding where the sufficiency of the evidence is in contention:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.... Instead, the relevant question is whether, after viewing the evidence in the light most favorable to

> the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Id. at 318-19 (internal citations omitted) (emphasis in original). See also Robertson v. Klem, 580 F.3d 159, 165 (3d Cir. 2009); Orban v. Vaughn, 123 F.3d 727, 731-33 (3d Cir. 1997).

In applying the Jackson standard, the reviewing court must consider each substantive element of the criminal offense at issue as defined under state law. Coleman v. Jackson, 566 U.S. 650, 655 (2012); Jackson, 443 U.S. at 324, n.16. "While the elements of a criminal conviction are to be defined by state law, a reviewing court's determination of whether sufficient evidence was produced to satisfy each element is governed by federal law." Vaughter v. Fisher, No. 12-CV-493, 2014 WL 1152540, at *15 (E.D. Pa. Mar. 24, 2014) (citing Coleman, 566 U.S. at 655). The Jackson standard is "deferential[,]" and "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." Coleman, 566 U.S. at 655.

The United States Court of Appeals for the Third Circuit has found that the Pennsylvania state law test for sufficiency of the evidence challenges is identical to the federal standard set forth in Jackson. See Evans, 959 F.2d at 1233 ("the formulation of the Pennsylvania test for insufficiency of the evidence is almost identical to that under federal law").

**1. Rape by Forceable Compulsion**

Applying the Pennsylvania standard for sufficiency of evidence, Trial Ct. Op. dated Aug. 3, 2016, at 15, the state court addressed Petitioner's claim that the evidence presented at trial was insufficient to convict him of Rape by Forceable Compulsion, in violation of 18 Pa. C.S.A. § 3121(a)(1).

Appellant[11] was convicted of Rape, which is defined as follows:

> § 3121. Rape
>
> **(a) Offense defined. --** A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:
>
> (1) By forcible compulsion.
>
> ***

With regard to the Rape conviction, the evidence in this case is sufficient to sustain a verdict of guilt. "A rape victim's uncorroborated testimony to penal penetration is sufficient to establish sexual intercourse and thus, support a rape conviction. *Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa. 1968) (citing *Commonwealth v. Poindexter*, 646 A.2d 1211, 1214 (Pa. Super. 1994). Holt testified credibly that on two occasions Appellant placed his penis into her vagina. Holt was able to provide details about the incidents such as the smell of Appellant's breath on the one occasion, the fact that one of the rapes occurred on a school night, Appellant's apology to her after the first rape and the fact that on one occasion she could recall Appellant's ejaculation onto her bed sheet. While a genital exam in January 2014, months after the two rapes, revealed no medical evidence of rape, Dr. Eichman testified to a reasonable degree of medical certainty that a lack of medical evidence in no way rules out the occurrence of sexual assault in Holt's case. Holt did not tell her mother about the rapes until roughly three months after the last incident, when Appellant was incarcerated for DUI and her mother was back in her life. Dr. Eichman opined that within the period of time between the last rape in October 2013 and the genital exam in January 2014, Holt's body could have completely healed and exhibited no signs of sexual assault.

"Forcible compulsion, as used in §3121(a)(1), includes not only physical force or violence but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against that person's will." *Commonwealth v. Rhodes*, 510 A2d 1217 (Pa. 1986).

> The determination of whether there is sufficient evidence to demonstrate beyond a reasonable doubt that an accused engaged in sexual intercourse by

[11] Once again, throughout its opinion on direct appeal, the state trial court refers to Petitioner as "Appellant," and to the victim as "Holt."

> forcible compulsion...is a determination that will be made in each case based upon the totality of the circumstances that have been presented by the fact-finder. Significant facts to be weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the physical setting in which the incident was alleged to have taken place, the extent to which the [accused] may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. This list of possible factors is by no means exclusive.

*Id.* at 1226. Here, several of these factors apply. First, "there is an element of forcible compulsion ... inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature and less sophisticated than the adult instructs the child to submit to the performance of sexual acts. This is especially true where the child knows and trusts the adult." *Id.* at 1227. Appellant, her biological father, is about sixteen years older than Holt. Appellant held a position of authority, domination and/or custodial control over Holt. Appellant was strict with Holt, admittedly a disciplinarian, and during the trial he suggested that Holt functioned below grade level. "The mere fact of a parent/child relationship without more does not establish the existence of moral, physical or intellectual force sufficient to sustain a conviction of rape. *Commonwealth v. Titus*, 556 A.2d 425, 429 (Pa. Super. 1989). However, here, several additional contributing factors to the rape conviction are Holt's youth and family circumstance, her testimony regarding Appellant's physical use of force to restrain her and Appellant's use of threats to keep Holt from divulging information about the rapes to anyone else. For example, during the first instance of rape, Holt testified that in response to her screaming and crying, Appellant told her to "shut up" and "placed his hand over her mouth." (TT I 40). Afterwards, Appellant told Holt that if she were to say anything to anyone he would hurt her mother and brother. (TT I 41, 46). During the second instance of rape, Appellant told Holt to disrobe, to which Holt responded "no." (TT I 44). When Holt got up and tried to leave, Appellant grabbed her, smacked her onto the bed and covered her mouth as she started to scream. (TT I 44). Given the totality of the circumstances, ample evidence supports this Court's finding that Appellant engaged in sexual intercourse with Holt by forcible compulsion.

"Issues of credibility are left to the trier of fact for resolution." *Commonwealth v. Brown*, 486 A.2d 441, 444 (Pa. Super. 1984)

> (citing *Commonwealth v. Farquharson*, 354 A.2d 545 (Pa. 1976)). Here, this Court found Holt to be credible. Holt's testimony was detailed, consistent and corroborated by other witnesses, including in many regards Appellant. Holt described Alexander and Appellant's relationship as "rocky." Given the chaotic circumstances of her home life, Holt was able to recall and describe her living arrangements and school attendance. She testified that she smelled alcohol on Appellant's breath during the first rape. Both Appellant and other witnesses testified that Appellant frequently went out drinking and eventually was incarcerated for DUI.
>
> While Appellant attempted to make much out of the Christmas card, the Commonwealth's interpretation of the card's text is persuasive. The card reads, in relevant part, "I know at this time I don't show it, but I do love you. I act the way I do because I never forgave the person who hurt me ... " (TT III 52). It is not uncommon for child rape victims to feel conflicted as to their feelings toward their perpetrators, especially when their perpetrators are close to them. During her childhood, Holt jumped from household to household, living with various individuals. She experienced both of her parents' incarceration. In the card, Holt also expressed that she had to "face the facts that [her] mom don't want [her] no more, but [Holt] [does] need her." (TT III 52). As the Commonwealth argued, Holt sounds like a child who is afraid of losing both of her parents, the two people she has in the world, despite the quality of their care for her. The defense focused on minor inconsistencies in Holt's testimony, such as whether or not Holt had a computer in her room. However, at trial, both Appellant and Holt testified that there was no computer in Holt's bedroom. The defense also focused on who typically did the laundry at the Nestle Street residence. Even if Alexander and Appellant testified truthfully and Alexander did the laundry, that in no way precludes the likelihood that Appellant would wash Holt's bloody sheets to hide evidence of his actions. Holt was consistent and detailed in providing her testimony, while Appellant and Alexander were often overly broad, especially with regard to Appellant never being alone with Holt. Even Appellant admitted that at times he was alone in a room with Holt.

Trial Ct. Op. dated Aug. 3, 2016, at 16-19 (footnote omitted).

The elements of rape by forceable compulsion include:

> "Sexual intercourse," [which] is defined: "In addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S.A. § 3101."

and

> that the defendant engaged in intercourse "by forcible compulsion." By statute, forcible compulsion includes "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S.A. § 3101. Thus, in addition to "sheer physical force or violence," forcible compulsion encompasses "an act of using superior force, physical, moral, psychological or intellectual[,] to compel a person to do a thing against that person's volition and/or will."

Com. v. Banniger, 303 A.3d 1085, 1092 (Pa. Super. Ct. 2023).

Upon review of the evidence on the state court record, including the testimony presented at Petitioner's trial, this Court cannot say that the state court's opinion was contrary to, or an unreasonable application of Jackson, or based on an unreasonable determination of the facts. Indeed, as set forth by the trial court above, sufficient evidence of all of the elements of this crime to support Petitioner's conviction is apparent from the state court record. Accordingly, this portion of Ground Two will be denied.

**2. Unlawful Contact with a Minor**

Similarly, the state trial court applied the Pennsylvania standard for sufficiency of evidence when it addressed Petitioner claim that the evidence presented at trial was insufficient to convict him of Unlawful Contact with a Minor, in violation of then 18 Pa. C.S.A. § 6318(a)(1).[12]

> Appellant was also convicted of Unlawful Contact with a Minor, which is defined as follows:
>
> > § 6318. Unlawful Contact with a Minor
> >
> > **(a) Offense defined. --** A person commits an offense if he is intentionally in contact with a minor, or a law enforcement officer acting in performance of his duties who has assumed the identity of a minor, for the purpose of engaging in an activity prohibited under any of the following and either the person

[12] As stated at footnote 3, supra, the relevant provisions of former Section 6318(a)(1) now is codified at 18 Pa. C.S.A. § 6318(a)(1.2).

> initiating the contact or the person being contacted is within this Commonwealth:
>
> (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).

18 Pa. C.S. § 6318.

***

> With regard to the Unlawful Contact conviction, sufficient credible evidence supports the verdict of guilt. Holt testified that during the instances of sexual touching at Bryant's residence, Appellant called her into his room or entered her room, removed her clothing and touched her vagina with his fingers, moving his fingers "in and out." (TT I 31-32). Appellant made noises while moving his fingers inside and outside of Holt's vagina. (TT I 32). Appellant engaged in communication, both verbal and physical, with Holt for the purposes of sexual contact. *See Commonwealth v. Leatherby*, 116 A.3d 73, 79-80 (Pa. Super. 2015).

Trial Ct. Op. dated Aug. 3, 2016.

Petitioner does not present any arguments in support of this portion of Ground Two in his operative Second Amended Petition. ECF No. 28-1 at 18-21.

The elements of this crime are: "(1) the person intentionally contacted a minor; (2) for the purpose of engaging in prohibited activity, such as involuntary deviate sexual intercourse; and (3) either the person initiating the contact or the person being contacted was within this Commonwealth." Com. v. Oliver, 946 A.2d 1111, 1113 (Pa. Super. Ct. 2008). The courts of Pennsylvania have interpreted the "contact" to involve communication, which need not be verbal. Com v. Rose, 960 A.2d 149, 152-53 (Pa. Super. Ct. 2008) ("By its plain terms, the statute prohibits the act of communicating with a minor for enumerated sexual purposes. The communication may take place in person, on the telephone, via a computer, or in other ways."). See also Com. v. Velez, 51 A.3d 260, 267 (Pa. Super. Ct. 2012)

> In the instant case, we conclude that there was sufficient evidence that Appellant had unlawful contact with the victim beyond the

> contact necessary to sustain the offense of aggravated indecent assault. The mother testified that when she saw Appellant touching the victim's vagina, the victim had her pants removed and her knees were in the air. The victim would not have had her pants removed and her legs in that position absent previous contact by Appellant, either verbal or physical. In order to engage in the assault, it is reasonable to infer that Appellant directed the victim, either verbally or nonverbally, to unclothe below the waist and to assume that pose.

In addition to the evidence cited by the trial court, the victim testified that Petitioner rubbed her legs when he initiated one of the rapes, and told her to "shut up" during its commission. Trial Tr. dated May 18, 2015, vol. 1 at 40. The victim further testified that Petitioner instructed her to take her clothes off during another rape. Id. at 44.

Upon review of the record before this Court, the undersigned cannot say that the trial court's determination was contrary to, or an unreasonable application of Jackson, or was based on an unreasonable determination of the facts. The trial court was not unreasonable when it concluded that the evidence presented during trial supported Petitioner's conviction for Unlawful Contact with a Minor under Pennsylvania law. Therefore, this portion of Ground Two will be denied.

### C. Ground Three will be Denied.

At Ground Three, Petitioner asserts that the trial court erred when it concluded that he knowingly and intelligently waived his right to a jury trial. ECF No. 28-1 at 22. This claim was exhausted at Petitioner's direct appeal. Holt, 2017 WL 6169102 at * 2.

Petitioner does not provide much in the way of factual argument as to this claim in his Second Amended Petition. See ECF No. 28-1 at 22-23. However, the factual basis that was presented on appeal to the Superior Court was that, although "the [trial] judge provided all of the information that, in the ordinary case, needed to be provided to a criminal defendant in order to ensure that his waiver of his fundamental right to be tried by a jury was intelligent, knowing, and voluntary[,]" Petitioner's waiver was not intelligent, knowing, and voluntary, because his trial

counsel had been convicted of several crimes in the past, which demonstrated his poor judgment. ECF No. 32-30 at 56. See also, generally, id. at 54-74.

A defendant may waive his federal right to a jury trial "where [the] action is taken with his express, intelligent consent, where the Government also consents, and where such action is approved by the responsible judgment of the trial court." Adams v. U.S. ex rel. McCann, 317 U.S. 269, 277-78 (1942). Whether a defendant's waiver was "intelligent, competent, [and] self-protecting" depends upon the circumstances of each case. Id. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970). See also Jackson v. Johnson, No. 16-1484, 2019 WL 13260175, at *14 (D.N.J. Mar. 19, 2019). "At a minimum, a defendant should be informed that a jury is composed of 12 members of the community, he may participate in the selection of jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right." United States v. Lilly, 536 F.3d 190, 198 (3d Cir.2008) (quoting United States v. Martin, 704 F.2d 267, 274-75 (6th Cir. 1983)).

The Superior Court adopted the trial court's reasoning as to this issue, id., which is as follows.

> Next, Appellant alleges that this Court erred when it accepted his jury trial waiver because this Court did not ensure Appellant was aware of his attorney's criminal record. Although Appellant does not specifically allege that his waiver was unknowing, unintelligent and/ or involuntary, he insinuates that his ability to make a knowing, intelligent, and voluntary waiver was impeded by his lack of knowledge regarding his attorney's private indiscretions.
>
>> Rule 620 of the Pennsylvania Rules of Criminal Procedure states that the defendant and attorney for the Commonwealth may waive a jury trial with approval by a judge of the Court in which the case is pending and elect to have the judge try the case

> without a jury. The judge shall ascertain from the defendant whether this is a knowing and intelligent waiver and such colloquy shall appear on the record. The waiver shall be in writing, made part of the record and signed by the defendant, the attorney for the Commonwealth, the judge and the defendant's attorney as a witness.

Pa.R.Crim.P. Rule 620. The Pennsylvania Supreme Court in *Commonwealth v. Williams,* held that for a waiver of a jury trial to be knowing, intelligent, and voluntary the record must show that the accused was advised of the "essential ingredients of a jury trial." *Commonwealth v. Dockins,* 397 A.2d 798, 800 (Pa. Super. 1979) (citing *Commonwealth v. Williams*, 312 A.2d 597 (Pa. 1973)). The essential ingredients of a jury trial consist of the requirements that: 1) the jury be chosen from members of the community; 2) the accused be allowed to participate in the selection of the jury panel; and 3) a jury verdict be unanimous. *Id.* Both the written and oral colloquies in this case meet all of the *Williams* requirements. Because the Criminal Information was amended, this Court, out of an abundance of caution, read through the charges and the maximum sentences at each count. (TT I 6). This Court then explained to Appellant that he is entitled under the Pennsylvania and United States Constitutions to a trial by jury. (TT III 8). Next, this Court explained that Appellant, along with his counsel and the prosecutor would have the opportunity to participate in the selection of a jury of his peers selected from the community. (TT I 9). This Court explained that Appellant would have the right to challenge members of the jury panel and that all twelve jurors would have to find and vote for Appellant's guilt before he could be convicted. (TT I 9-10). Appellant indicated that he understood his rights and was knowingly, intelligently and voluntarily waiving his right to a jury trial and electing to proceed non-jury. (TT I 11-12). The written colloquy was reviewed and incorporated into the record. (TT I 12-13).

Even if this Court had personal knowledge of an attorney's personal life, it is not the Court's obligation to inform Appellant of his retained counsel's personal history. Furthermore, Appellant has not explained how such information would have affected his decision to proceed nonjury in this case. Appellant concedes that "ordinarily, there is no need to ensure that a criminal defendant knows of his attorney's personal difficulties, or of [his attorney's] summary offense convictions or of personal details about that [attorney]." (Statement of Errors Complained of on Appeal, p. 5, n. 5). Under the law, Appellant waived his right to a trial by jury knowingly and of his own free will.

Trial Ct. Op. dated Aug. 3, 2016, at 20-21.

Upon review of the record, including Petitioner's oral colloquy during which he waived his right to trial by jury, see Trial Tr. dated May 18, 2015, vol. 1, at 4-13, see also Part IV.D.2, infra, Petitioner has failed to show that the state court's determination was contrary to, or an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts. Therefore, Ground Three will be denied.

**D. Ineffective Assistance of Counsel**

The remainder of Petitioner's asserted grounds for relief sound in ineffective assistance of counsel. Accordingly, the "clearly established Federal law" at issue with respect to Grounds Four and Five is the effective assistance of counsel standard set forth in Strickland.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland, 466 U.S. at 684). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id. Instead, Petitioner is required to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2001) (quoting Strickland, 466 U.S. at 687).

The second prong requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id. "It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999).

In considering a claim of ineffectiveness of counsel, Pennsylvania uses a three-part effectiveness test.

> To plead and prove ineffective assistance of counsel a petitioner must establish: "(1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." Commonwealth v. Stewart, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). The failure to meet any of these aspects of the ineffectiveness test results in the claim failing. Id.

Future v. Ferguson, No. 16-2346, 2022 WL 2307095, at *8 (M.D. Pa. June 27, 2022), certificate of appealability denied sub nom. Future v. Sup't Benner Twp. SCI, No. 22-2419, 2022 WL

18536146, at *1 (3d Cir. Dec. 6, 2022). The United States Court of Appeals for the Third Circuit has found this test not to be contrary to Strickland. Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

Here, the Superior Court applied Pennsylvania's three-part test to Petitioner's claim of ineffective assistance of counsel in his PCRA appeal. Holt, 2020 WL 398594, at *2. Accordingly, the Superior Court's analysis was not contrary to Strickland.

Petitioner's remaining claims will be addressed *seriatim.*

### 1. Ground Four will be denied.

At Ground Four, Petitioner asserts that his trial counsel was ineffective for failing to locate, interview, and call Petitioner's mother as a witness at trial. ECF No. 28-1 at 26.

The Superior Court thoroughly addressed this claim in Petitioner's first PCRA appeal.

> Finally, Holt claims that trial counsel was ineffective for failing to call his mother, Peggy Holt, as a witness at trial. Holt asserts that: (1) the victim in this case recanted her allegations to his mother; (2) he advised counsel of the witness' existence; (3) the witness would have testified on his behalf; and (4) the absence of her testimony prejudiced him in that it would have called into question the veracity of the victim's testimony. Holt is entitled to no relief.
>
> Counsel may be deemed ineffective for failing to call a witness where a petitioner proves that: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on petitioner's behalf; and (5) the absence of the testimony prejudiced petitioner. ***Commonwealth v. Michaud***, 70 A.3d 862, 868 (Pa. Super. 2013).
>
> Here, Holt testified at his PCRA hearing that he met with Attorney Westcott multiple times prior to trial and provided him with a list of witnesses to contact, including his mother. N.T. PCRA Hearing, 3/15/19, at 15. Peggy Holt testified that the victim, her granddaughter, came to her and told her that she had fabricated the rape claims against Holt because she was mad at him. ***See id.*** at 34. She further stated that she would have testified had she been called to do so, ***id.***; however, she also stated that she was unaware that her

son was on trial until he was sentenced. ***See id.*** at 35. On cross-examination, Holt testified that she never contacted the police regarding the alleged recantation or advised the victim to do so. ***See id.*** at 37-38.

Attorney Westcott testified that he contacted several witnesses prior to trial. ***See id.*** at 47. He stated that he could not specifically remember whether Holt asked him to contact his mother. ***See id.*** at 52. However, Attorney Westcott testified that, even if Holt had asked him to contact his mother, Attorney Westcott may ultimately have chosen not to present her testimony for credibility reasons. The following exchange occurred on cross-examination by the Commonwealth:

> Q. Is there any—sorry. Let me rephrase. Is there any skepticism about putting on a family member in a case such as this with concerns of credibility?
>
> A. Absolutely. There's always going to be a bias, I believe, by the finder of fact that the family member's going to be biased in favor of the defendant.
>
> Q. So it could be pretty reasonable that had you known about Ms. Holt and what she could have potentially testified to at the time of trial, that you may not have put her on simply for the fact that she may not be considered credible to the jury?
>
> A. Yeah, I may or may not have depending on --
>
> Q. Or to the Judge being the fact finder?
>
> A. Yes. Every case is different, but because somebody's going to speak on behalf of the defendant, I don't believe it's automatically credible.
>
> Q. **But in this case, if the petitioner had mentioned that the victim in this case recanted to his mom and that he wanted you to speak with her, you would have pursued that avenue. Correct?**
>
> A. **There would be no reason why I would not have.**
>
> Q. **At least to see what she had to say?**
>
> A. **Correct.**

> ***Id.*** at 53-54 (emphasis added).
>
> The PCRA court concluded as follows:
>
>> If [Holt's mother] had exculpatory information, it makes no sense that she would not reach out to the police or to her son's attorney with this information. [Holt] did not tell [his mother] when the trial was scheduled or seek a continuance when she failed to appear. A far more likely scenario is that[,] had this witness existed at the time of trial, trial counsel, who had otherwise thoroughly prepared for trial, would have interviewed the witness and determined her credibility, or lack thereof. Moreover, the unsubstantiated, recently produced statement of recantation would be subject to significant and damaging cross-examination, and would be considered in the light of substantial evidence supporting [Holt's] conviction.
>
> PCRA Court Opinion, 6/7/19, at 5.
>
> Upon review, we can discern no abuse of discretion in the court's finding that Holt's version of events was simply not credible. Accordingly, because Holt failed to prove either that he informed Attorney Westcott of his mother's purported testimony prior to trial or that his mother was available and prepared to testify to the alleged recantation at the time of trial, he cannot establish Attorney Westcott's ineffectiveness. ***Michaud***, ***supra***. Therefore, Holt is entitled to no relief.

Holt, 2020 WL 398594, at *5-6 (emphasis as in Superior Court Memorandum).

At the outset, the Third Circuit disfavors the five-factor test applied by the Superior Court above – specifically with respect to the witness' willingness to cooperate.

> As we have said before, and reiterate once again, "[a]bsent extenuating circumstances, such as the existence of a privilege or the witness's incapacity or death, whether a witness is ready and willing to testify is irrelevant since defense counsel can compel testimony through a trial subpoena."
>
> ***
>
> Unwilling witnesses can be *made* to testify.

Williams, 45 F.4th at 720-21 (emphasis in original).

But, as is clear from the above passage from the Superior Court's Memorandum, its decision did not rest solely on the willingness prong, but on whether Petitioner had informed his trial counsel of his mother's purported testimony as well. That is not inconsistent with Strickland. See Part III.B.3, supra. (quoting Strickland, 466 U.S. at 691, in connection with Petitioner's defaulted failure to investigate claim at Ground Six).

Here the PCRA trial court did not find the evidence presented by Petitioner in his first PCRA proceeding to be credible. This credibility determination, as affirmed by the Superior Court, is a factual finding that is presumed to be correct under 28 U.S.C. § 2254(e)(1). See, e.g., Wheeler v. Rozum, 410 F. App'x 453, 459 (3d Cir. 2010). Petitioner has not established, by clear and convincing evidence, that this finding was incorrect. Nor does the state court record show that the Superior Court's decision was contrary to, or an unreasonable application of the Strickland standard, or based on an unreasonable determination of the facts. Accordingly, Ground Four will be denied.

**2. Ground Five will be denied.**

At Ground Five, Petitioner argues that trial counsel was ineffective for allegedly misrepresenting that his case would be dismissed if Petitioner waived his right to a jury trial. ECF No. 28-1 at 29. He alleges that trial counsel was untruthful in his testimony with respect to this issue during his PCRA hearing. Id.

The Superior Court addressed this claim in his first PCRA appeal as follows.

> Holt first claims that Attorney Westcott was ineffective for causing him to waive his right to a jury trial when that waiver was not knowing, intelligent and voluntary. In particular, Holt alleges that counsel "made multiple and material misrepresentations to [him] concerning his supposedly **certain** likelihood of success at a non-jury trial before [the Honorable Jill E. Rangos], which caused and induced [Holt] to involuntarily deviate from his original intent to

proceed to a jury trial[.]" Brief of Appellant, at 23-24 (emphasis in original). Holt is entitled to no relief.

Our Supreme Court has long held that counsel's advice to waive a jury trial can be the basis for a successful claim of ineffective assistance of counsel only when: (1) counsel interferes with his client's freedom to decide to waive a jury trial or (2) the petitioner can point to specific advice of counsel so unreasonable as to vitiate the knowing and intelligent waiver of the right. ***Commonwealth v. Boyd***, 334 A.2d 610, 617 (Pa. 1975). However, all that is required for a valid jury trial waiver is that a defendant is informed "that the jury be chosen from members of the community (a jury of one's peers), that the verdict be unanimous, and that the accused be allowed to participate in the selection of the jury panel." ***Commonwealth v. Mallory***, 941 A.2d 686, 696-97 (Pa. 2008) (citations omitted). When a petitioner seeks to collaterally attack his waiver of a jury trial on grounds that it was caused by the ineffective assistance of his trial counsel, he must demonstrate a reasonable probability that, but for counsel's constitutionally deficient service, he would not have waived his right to a jury trial. ***Id.*** at 704.

At his PCRA hearing, Holt testified on direct examination that, in the "bullpen" immediately prior to the commencement of his jury trial, Attorney Westcott told him that: (1) the assistant district attorney and arresting officer believed the charges against him to be false; (2) someone had spoken to Judge Rangos about his case; and (3) his case would be thrown out if he proceeded to a nonjury trial. ***See*** N.T. PCRA Hearing, 3/15/19, at 10-13. He also stated that he signed a written jury waiver form, but counsel did not explain it to him and he was unable to read at the time. ***See id.*** at 14. Holt testified that he would not have waived his right to a jury trial in the absence of Attorney Westcott's representations. ***See id.*** at 15.

On examination by the PCRA court, Holt testified that he lied during his oral waiver colloquy when he responded in the affirmative to the following questions from the court: (1) whether he could read and write the English language; (2) whether anyone had offered him anything in exchange for waiving his right to a jury trial; and (3) whether anyone had forced, threatened or coerced him into waiving his right to a jury trial. ***See id.*** at 18, 25, 26 ("The Court: Okay. So now you're saying you lied? The Witness: Yes, ma'am.").

Holt's paramour, Roxanne Alexander, also testified at the PCRA hearing, stating that Attorney Westcott asked her to tell Holt to request a nonjury trial. Alexander testified that Attorney Westcott "said that—basically that him and the judge, they were cool, they were friends, and basically [Holt] didn't have nothing to worry

about" and that Holt would be found not guilty if he accepted a nonjury trial before Judge Rangos. ***Id.*** at 29.

Attorney Westcott also testified at the PCRA hearing. Counsel testified that he had initially listed Holt's case for a jury trial, because it was his standard practice to do so in cases where he had not yet had the opportunity to thoroughly review the case and discovery. ***See id.*** at 50. He further stated that he never asked Holt to waive his right to a jury trial; rather, during a meeting with Holt at the county jail, Attorney Westcott "went over the analysis of this case with Mr. Holt, and [he] explained to him the pros and cons of a jury [trial] vis-à-vis a nonjury [trial]." ***Id.*** at 43. Attorney Westcott stated that it was Holt's decision to waive his right to a jury trial. ***See id.*** at 42. Attorney Westcott testified that, contrary to Holt's assertion, the decision to waive was not made "in the bullpen" on the day of jury selection, but rather beforehand. ***Id.*** at 45. Attorney Westcott had no recollection of ever having spoken to the arresting officer, and the arresting officer never told him that he believed the victim to be untruthful. ***See id.*** at 46. Moreover, counsel testified that he never told Holt that if he opted for a nonjury trial, the court would acquit him. ***See id.*** at 42-43. Nor did Attorney Westcott suggest that he was friends with the judge. Rather, he testified he told Holt "I think we have a good professional relationship" but that he couldn't "guarantee anything." ***Id.*** at 45. Finally, Attorney Westcott testified that it would have been his practice to review the waiver form with his client before allowing him to sign it. ***See id.*** at 46.

The PCRA court noted that Holt and Attorney Westcott "testified to a considerably different version of events" and credited the latter's testimony. PCRA Court Opinion, 6/7/19, at 4. The court concluded:

> [Holt] asserts that he was duped by his trial counsel to choose a nonjury trial because of a secret relationship entitling him to special dispensation from the [c]ourt. These scurrilous accusations are not only unsubstantiated and untrue, they are refuted by trial counsel's testimony that he made no such promises and that no such relationship ever existed. Moreover, [Holt] has failed to argue in what manner the outcome of the proceedings would have differed had the case proceeded to a jury trial.

***Id.***

Upon review of the transcript of the PCRA hearing, we can discern no abuse of discretion on the part of the court in crediting counsel's testimony and denying relief.

In addition, prior to waiving his right to be tried by a jury, Holt completed a written waiver form and was thoroughly colloquied by the trial court as follows:

> THE COURT: **Are you able to read, write and understand the English language?**
>
> THE DEFENDANT: **Yes, ma'am.**
>
> ...
>
> THE COURT: Do you understand that you're entitled under the Constitution of the Commonwealth of Pennsylvania as well as the United States Constitution to a trial by jury on these charges?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Do you understand that if you choose to have a jury trial, you, along with Mr. Westcott and Mr. Hong-Barco, would participate in the selection of that jury from your peers. That is, members of Allegheny County selected by a computer from various approved lists?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Do you understand that you would have the right to challenge members of the jury panel? That means that you would have the right to keep certain members of the jury panel from serving as jurors in your case.
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Specifically, do you understand that you would have as many challenges for cause as the Court would approve. A challenge for cause is a showing of some good reason why you believe that a member of the jury panel could not serve as a fair or impartial juror in your case?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: In addition to an unlimited number of strikes for cause, you would have seven preemptory challenges. A preemptory challenge is one in which you do not need to give any reason for striking a

member of the jury panel and keeping them from serving as a juror in your case; do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand that all jurors so selected would have to find and vote for your guilt before you could be adjudicated guilty. That is, their verdict would have to be unanimous?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand that in a nonjury trial before a judge that the judge sits as the trier of facts. And much like a jury trial is bound by the same rules of evidence but it is a judge rather than the jury that determines your guilt or innocence from the evidence presented?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand that in a jury trial, as in a nonjury trial before a judge, you do enter the courtroom cloaked in the presumption of innocence and that presumption remains with you at all times until such time that the Commonwealth should produce evidence for a judge or a jury to find you guilty beyond a reasonable doubt?

THE DEFENDANT: Yes, ma'am.

THE COURT: Specifically, before a judge or a jury could find you guilty, the Commonwealth must prove each and every element of the crimes beyond a reasonable doubt and as the defendant you bear no burden of proof; do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Have you discussed with Mr. Westcott your intention to waive your right to a jury trial and proceed nonjury before me, understanding that it would be me who would decide your guilt or innocence from the evidence presented by the Commonwealth?

THE DEFENDANT: Yes, ma'am.

THE COURT: Knowing all that and having discussed this with Mr. Westcott, it is my understanding that you do wish to voluntarily waive your constitutional right to a jury trial and proceed before me without a jury; is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand completely the proceedings here today?

THE DEFENDANT: Yes, ma'am.

THE COURT: **Has anybody forced, threatened, or coerced you into waiving your right to a jury trial?**

THE DEFENDANT: **No, ma'am.**

THE COURT: And you are satisfied with legal advice and services Mr. Westcott has provided?

THE DEFENDANT: Yes, ma'am.

THE COURT: **Has anybody promised you anything in exchange for waiving your constitutional right to a jury trial?**

THE DEFENDANT: **No, ma'am.**

THE COURT: I call your attention to the Waiver of Jury Colloquy, and this is the document I'm now showing you.

THE DEFENDANT: Yes, ma'am.

THE COURT: **You did have the opportunity to read this document and discuss it with Mr. Westcott?**

THE DEFENDANT: **Yes, ma'am.**

THE COURT: **You answered all of the questions in here honestly?**

THE DEFENDANT: **Yes, ma'am.**

THE COURT: And you indicated by adding your signature on the last page that you have read the

> entire document and you understand its full meaning; is that true?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Is that your signature on the fourth page?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: In addition to that, you've added your signature on the first page indicating that you do wish to waive your right to a jury and proceed nonjury; is that correct?
>
> THE DEFENDANT: Yes, ma'am.

> N.T. Waiver Trial, 5/18/15, at 5, 8-13 (emphasis added).
>
> The trial court's colloquy was comprehensive and satisfied the prerequisites for a knowing, intelligent and voluntary waiver. ***Mallory*, *supra***. Moreover, Holt's claim that trial counsel was ineffective for coercing him to waive his right to a jury trial requires accepting that he lied while under oath. It is well-settled that a PCRA petitioner "may not obtain post-conviction relief by claiming that he lied during his waiver colloquy." ***Commonwealth v. Bishop***, 645 A.2d 274, 277 (Pa. Super. 1994); ***see also Commonwealth v. Pollard***, 832 A.2d 517, 523 (Pa. Super. 2003) ("The longstanding rule of Pennsylvania law is that a defendant may not challenge his [colloquy] by asserting that he lied while under oath, even if he avers that counsel induced the lies."). As Holt's allegation of ineffectiveness is predicated on the notion that he lied during his waiver colloquy, his claim must fail.

Holt, 2020 WL 398594, at *2-5 (emphasis as in Superior Court Memorandum).

As with Ground Four, the PCRA trial court's credibility determination, as affirmed by the Superior Court, is a factual finding that is presumed correct under Section 2254(e)(1). Wheeler, 410 F. App'x at 459. Additionally, Petitioner's answers during his oral colloquy that he was not made promises or coerced into waiving his right to a jury trial presents strong evidence that his waiver was freely made. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."). Further, for the reasons stated at Part IV.C,

supra, even if Petitioner had been unable to read at the time that he reviewed his written colloquy, the oral colloquy conducted by the trial court ensured that his waiver was knowing, intelligent, and voluntary.

Petitioner has failed to show that the Superior Court's decision as to this claim was contrary to, or an unreasonable application of either prong of the Strickland test. See also Vickers v. Sup't Graterford SCI, 858 F.3d 841, 857 (3d Cir. 2017), as amended (July 18, 2017) (prejudice test in claim of ineffective assistance of counsel leading to improper waiver of right to jury trial is "a reasonable probability that but for his counsel's failure to ensure a proper waiver of his Sixth Amendment right to be tried before a jury, he would have exercised that right."). He further has failed to show that that decision was based on an unreasonable determination of the facts. Accordingly, Ground Five will be denied.

## V. CERTIFICATE OF APPEALABILITY

A certificate of appealability should be denied, as jurists of reason would not debate that Petitioner has failed to show entitlement to relief. See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000); 28 U.S.C. § 2253(d). As to the claims denied on procedural ground, jurists of reason would not debate that this Court was correct in its procedural ruling and/or that the defaulted claims state a valid claim of a denial of a constitutional right. Slack, 529 U.S. at 474.

## VI. CONCLUSION

For the foregoing reasons, the operative Second Amended Petition, ECF No. 28, will be denied, and that a certificate of appealability likewise will be denied.

An appropriate Order follows.

BY THE COURT,

Date: September 9, 2026

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc: Mattise J. Holt
MD-9545
SCI Houtzdale
P.O. Box 1000
Houtzdale, PA 16698

All counsel of record via CM-ECF